## UNITED STATES v. NORTHERN PAC. RY. CO. *

Circuit Court of Appeals, Eighth Circuit. January 21, 1929.

No. 8061.

Pollock, District Judge, dissenting.

*Rehearing denied May 2, 1929.

O. R. McGuire, Sp. Asst. Atty. Gen. (Herman J. Galloway, Asst. Atty. Gen., and Lafayette French, Jr., U. S. Atty., of Austin, Minn., on the brief), for the United States.

M. L. Countryman, Jr., of St. Paul, Minn. (C. W. Bunn and D. F. Lyons, both of St. Paul, Minn., on the brief), for defendant in error.

Before VAN VALKENBURGH and BOOTH, Circuit Judges, and POLLOCK, District Judge.

VAN VALKENBURGH, Circuit Judge. Defendant in error, plaintiff below, brought suit against the United States of America, defendant below, to recover the sum of $1.60— the difference between a net per capita fare of $33.09, claimed by the plaintiff for transporting two members of the United States Marine Corps from St. Paul, Minn., to Seattle, Wash., and a net per capita fare of $32.-29, paid for the transportation and accepted by the railroad company under protest. This suit is the result of a disagreement between the parties as to the proper computation of land grant deductions from the commercial fare over the route traveled. The case was tried upon an agreed statement of facts. The court ruled in favor of the railroad and entered judgment accordingly. In the stipulation as to the facts it was agreed that the Northern Pacific Railway Company is a corporation organized and existing under the laws of the state of Wisconsin, and is engaged in the operation of various lines of railroad into and through the states of Wisconsin, Minnesota, North Dakota, Montana, Idaho, Washington, and Oregon, and is a common carrier of freight and passengers. It maintains its principal operating and business offices in the city of St. Paul in the state of Minnesota.

"The plaintiff is the successor in title and interest to the properties of the Northern Pacific Railroad Company, a corporation which was created by 'An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's Sound, ~n the Pacific Coast, by the northern route.' By said act, approved July 2, 1864 (13 Stat. 365), the Northern Pacific Railroad

Company was 'authorized and empowered to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph line, with the appurtenances, namely, beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin; thence westerly by the most eligible railroad route, as shall be determined by said company, within the territory of the United States, on a line north of the forty-fifth degree of latitude to some point on Puget's Sound, with a branch, via the valley of the Columbia river, to a point at or near Portland, in the state of Oregon,' etc.

"The Northern Pacific Railroad Company, as authorized by the Act of July 2, 1864, was required to be 'constructed in a substantial and workmanlike manner, with all the necessary draws, culverts, bridges, viaducts, crossings, turnouts, stations, and watering places, and all other appurtenances, including furniture, and rolling stock, equal in all respects to railroads of the first class, when prepared for business.' For the construction of the proposed railroad and telegraph, the Northern Pacific Railroad Company was granted 'the right of way through the public lands to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turntables, and water stations.' It was also granted certain alternate sections of land on each side of the right of way 'for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific Coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway.' The act further provided 'that said Northern Pacific Railroad, or any part thereof, shall be a post route and a military road, subject to the use of the United States, for postal, military, naval, and all other government service, and also subject to such regulations as Congress may impose restricting the charges for such government transportation' with the further provision 'that the said company shall not charge the government higher rates than they do individuals for like transportation and telegraphic service.' "

The original line of railroad under the Act of July 2, 1864, was from Ashland, Wis., on the shores of Lake Superior, through Brainerd, Minn., and Meeker, Wash., to Tacoma, Wash., on Puget's Sound. Later a line of railroad, now owned and operated by the Northern Pacific Railway Company, was con-

structed between St. Paul, Minn., and Brainerd, Minn., intersecting the original line at the latter point; this line, prior to its acquisition by plaintiff, had been constructed by various corporations and the portion thereof between Watab and Brainerd had been granted lands in aid of that construction. The plaintiff company also operates by lease over a land grant railroad between St. Paul and Minneapolis, a distance of 8.23 miles. In the year 1890 the Northern Pacific Railroad Company, plaintiff's predecessor, purchased a line of railroad from Meeker, Wash., a point on its original line, to Seattle, Wash. The total line of railroad between St. Paul and Seattle, through Brainerd, Minn., and Meeker, Wash., contains 1,962.21 miles of road, of which 1,855.67 miles were constructed by aid of grants of lands subject to the conditions hereinabove stated as to government transportation, the ratio of land grant to the total length of the road being 47.285 per cent. We quote from paragraph 8 of the agreed statement of facts:

"After the construction of the original line between Ashland, Wis., and Tacoma, Wash., and the construction of the line from St. Paul to Brainerd as set forth above, a cut-off line was constructed in 1889 from Little Falls, Minn., to Staples, Minn., a distance of 33.90 miles, as compared with the route between Little Falls and Staples via Brainerd, a distance of 60.64 miles. Since the construction of this short line between Little Falls and Staples, the route via Brainerd has been used for local traffic exclusively; the through traffic from St. Paul to the Pacific Coast being routed via the shorter line between Little Falls and Staples. In the year 1890 the Northern Pacific Railroad Company, plaintiff's predecessor, acquired by purchase a line of railroad from Meeker, Wash., a point on its original line, to Seattle, Wash., and in 1902 plaintiff constructed a cut-off from Palmer Junction, Wash., to East Auburn, Wash., which has since been used for transcontinental train service instead of the original mileage from Palmer Junction via Meeker, Wash., and has reduced the mileage from Palmer Junction to Seattle, Wash., to 44.3 miles, instead of 64.20 miles. By the use of the cut-offs between Little Falls and Staples and between Palmer Junction and East Auburn, the distance traveled by through trains from St. Paul to Seattle is only 1,914.57 miles, of which 1,761.43 miles is land-aided mileage."

The ratio of land grant to the total length of the road computed by this route is 46.001 per cent. From the foregoing it will be seen that the mileage traversed by through trains between St. Paul, Minn., and Seattle, Wash., has been reduced from the original mileage by 47.64 miles and the land grant mileage by 94.24 miles. Pursuant to the power to regulate charges for government transportation conferred by the Act of July 2, 1864, Congress has provided that the rate for such transportation shall not exceed 50 per cent. of the full amount of compensation computed on the basis of the tariff or lower special rates for like transportation performed for the public at large. Under Joint Military Passenger Agreement No. 2, effective July 1, 1924, the government is entitled to an additional 3 per cent. reduction from the rates charged the public at large. The contentions of the parties respecting the proper deductions to the government from the commercial fare is thus stated in the stipulation of facts:

"The sum of $33.09 claimed by plaintiff for the transportation services furnished each of the above mentioned soldiers represents the deduction from the commercial fare of $63.16, or 50 per cent. of $\frac{1,761.43}{1,914.57}$ of said fare, or 46.001 per cent. of said fare, less a further undisputed deduction of 3 per cent. The sum of $32.29, paid by defendant in each instance, represents the deduction of 47.285 per cent. from said fare of $63.16, and the deduction of 3 per cent. above mentioned, and is computed by taking the proportion of aided mileage to total mileage from St. Paul to Seattle, via plaintiff's lines of railroad through Brainerd, Minn., and Meeker, Wash., such total distance being 1,962.21 miles, of which 1,855.67 miles were constructed by aid of grants of public lands as hereinbefore set forth. If plaintiff is entitled to recover, the amount due is $1.60."

The situation with respect to transportation, due to the cut-offs between Little Falls and Staples, and between Palmer Junction and East Albany, is thus stated in paragraph 9 of the stipulation:

"During all of the times herein mentioned plaintiff has maintained all of its land grant lines of railroad including those contained in its alternate routes between St. Paul and Seattle via Brainerd, Minn., and Meeker, Wash., in suitable condition for its use and for use as post and military routes, and has furnished passenger train service thereover and over its entire system which has been and is suitable and adequate for serving the public. The passenger train service maintained by plaintiff via Brainerd and Meeker was not and is not designed for the accommodation of continuous through travel from St. Paul to Seattle, and was and is an inferior class of service for such through travel, and is not

suitable and adequate for the use of defendant in the transportation of troops from St. Paul to Seattle. The travel time via the shorter route is 59 hours and 40 minutes. The travel time via the longer route is 99 hours and 45 minutes, with four transfers in route."

The contention of the government is that, by the construction of these cut-offs and the withdrawal of through trains and fares over the longer route, the railroad has, in effect, established a lieu line, and has as effectually closed the longer route to through government traffic as if the rails along that route had been removed. It is therefore claimed that the United States is entitled to deduction from the through commercial fare from St. Paul to Seattle on the basis of the land grant ratio established when the railroad line between these points was first constructed and the grants of public land were made.

In reaching his conclusion the trial judge was undoubtedly influenced by the consideration that the route from St. Paul to Seattle is not in its entirety the original line constructed from Ashland, on the shore of Lake Superior, to Tacoma, a point on Puget's Sound. He says:

"The original line of the Northern Pacific was from Ashland, Wis., on Lake Superior, to Tacoma, Wash., on Puget Sound. Only that portion of it between Staples and Palmer Junction constitutes any part of the original land grant route of the plaintiff to the Coast. The line of the old and defunct Western Railroad Company from Watab to Brainerd is the only part of that government aided road used by the plaintiff for its through route. To reach Seattle, after the line to Tacoma was built, it constructed or obtained a line from Palmer Junction, via Auburn, to Seattle, without aid of the government, so that it has a through route, not originally a government aided single system, but composed partly of lines of government aided road and partly of nonaided lines, which it has built or bought. If the Gregory-Staples or the Palmer Junction-Auburn cut-off was a mere straightening out of the original Northern Pacific land grant system, I would think that the government's position was correct, and that the through route was an alternate route established for reasons of economy or more efficient operation; but, under the circumstances, I am unable to so hold. If there was no line from St. Paul to Staples, or to Brainerd, if the original through route was St. Paul to Duluth via the old government aided St. Paul & Duluth line, and thence to Auburn over the government aided Northern Pacific line, if the plaintiff had constructed a cut-off from St. Paul to Staples without aid, and had routed its through travel over that line, and thence to Seattle, could it be claimed with any show of reason that that was a mere alternate or lieu route and that the government was entitled to base the deduction from the through fare on the proportion of land grant mileage to non-land grant mileage of the original route? It seems to me that no such contention could be sustained, and, on principle, the situation presented is identical."

But it is conceded that parts of the system, as now composed, were constructed by various corporations, of which the defendant is now the successor, charged with all the obligations of its predecessors; that the plaintiff below maintains its principal operating and business offices in the city of St. Paul; that all the through traffic of the Northern Pacific Railway Company to the Pacific Coast starts at St. Paul, with Seattle, Wash., as its point of destination. Since the establishment of the line from Carlton, Minn., to St. Paul, and that from St. Paul to Brainerd, on the line as originally constructed, St. Paul has been accepted as the eastern terminus of the line contemplated by the Act of July 2, 1864; and the route from St. Paul to Seattle, via Brainerd and Meeker, for more than 30 years has been treated by both government and railroad as a route subject to land grant deductions under the provisions of that act. ▇▇ We may, therefore, lay aside all question as to the effect of the substitution, if it be such, of St. Paul and Seattle as the termini of the land grant aided line under consideration. The railroad concedes that it is under obligation to apply the percentage of 47.285 to fares for government transportation over the route from St. Paul to Seattle via Brainerd, Minn., and Meeker, Wash. It remains only to consider the effect upon such fares of the Little Falls-Staples and Palmer Junction-Auburn cut-offs, by which the land grant mileage is reduced by 94.24 miles. The trial court concedes that if these cut-offs are to be regarded as "a mere straightening out of the Northern Pacific land grant system," the position of the government is a correct one. The word "straightening," as used, is synonymous with "shortening." Throughout record, briefs, and argument it is stated repeatedly that the cut-offs made have shortened the route between St. Paul and Seattle. To the extent that they have reduced the distance between these two points, they have had a straightening effect. In this view, which seems sound,

they are in no sense additions, which, when constructed without government aid, do not carry land grant obligations. United States v. Kansas Pac. R. Co., 99 U. S. 455, 25 L. Ed. 289; United States v. Central Pac. R. Co., 118 U. S. 235, 6 S. Ct. 1038, 30 L. Ed. 173.

But defendant in error insists that there has been thus created a new route, which is additional to those required to be established and maintained under the Land Grant Act. To this we are unable to accede. According to the stipulated facts, what is termed the old line, via Brainerd and Meeker, is used for local traffic exclusively, while the so-called "new line" carries all the through traffic "from St. Paul to the Pacific Coast." It thus appears that, except by this latter route, through carriage by the Northern Pacific to the entire Pacific Coast is abandoned. It is true that the old line is still in partial operation. The government may still transport its troops by means of "an inferior class of service," "not suitable and adequate" for its use in the transportation of troops from St. Paul to Seattle, if it is willing to consume 99 hours and 45 minutes, with four transfers en route, as against 59 hours and 40 minutes, without transfer, by the shorter route. Is this the service contemplated by the act, which demanded a railroad of the first class, and under which the government granted, not only an ample right of way through the public domain, covering nearly 2,000 miles, including all necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turntables and water stations, but also a vast acreage in alternate sections of land on each side of the right of way? And this grant was made for the expressed purpose of securing "safe and speedy transportation of the mails, troops, munitions of war and public stores over the route of said line of railway." In closing the Brainerd-Meeker route to through carriage, the defendant in error has, in effect, abandoned its land-aided line to that extent. For its own convenience in competition with other roads, and perhaps for other reasons, it has shortened its line by 47.64 miles and over the line thus shortened or straightened it routes all its through traffic. By this almost nominal modification of route it deprives the United States of one of the most important considerations for its grant, to wit, speedy, through transportation to the coast, unless it accepts fare reductions not in harmony with the legislation as construed by the parties to the contract over a long period. It is true that the through fare, owing to competition,

is not constructed strictly on a mileage basis, but on the shortest mileage between St. Paul and Seattle, by combining the short routes of the competitive roads. But such reduced rates are open to the government, with the same ratio of reduction. Louisville & Nashville R. Co. v. United States, 273 U. S. 321, 47 S. Ct. 365, 71 L. Ed. 661.

The amount at stake in the case at bar is inconsiderable, but the principle involved is far-reaching in its potential consequences. If the slight deviations from the recognized land grant route, brought about by these cutoffs, be accepted as the establishment of a new route, partially absolved from land grant reductions in fares, it would be easy, under the rule thus laid down, by degrees to whittle away the reserved rights of the government. By analogy the language of the Supreme Court of Wisconsin in Attorney General v. West Wisconsin Railway Co., 36 Wis. 466–495, has application:

"It would be a strange disposition of the bounty of the United States, and of the state, for the endowed company to build 20 miles of road and receive corresponding 20 miles of grant; take up the 20 miles of road built, build other 20 miles of road, and receive other 20 miles of grant; take that up in turn, and so on to the end; absorbing the whole grant and leaving no vestige of road in the route of the grant. This the defendant can do, if it can without legislative authority take up one mile of the land grant road built. The acceptance of the franchise, in any case, involves a public trust; in this case it involves a public trust upon valuable consideration, in addition to the consideration of the franchise. We apprehend that the bare statement of the scope of the proposition is sufficient to show it as deficient in morality as in logic."

The construction placed upon this and like situations by the executive officers of the government is thus stated in the stipulation of facts:

"The accounting officers of the United States have held since 1888 that, where a land grant route is established and made subject to land grant deductions for government transportation, an alternate route thereafter established by the same company is subject to deduction on account of land grant according to the land grant ratio established upon the original completion of the road. The principle was originally stated by Second Comptroller of the Treasury in decision of April 17, 1888, as follows: 'If a railroad have a line between two points aided in whole or in part, and subsequently acquire a new

line or lines, nonaided, between those same points, the account for government transportation, when performed over the new line or lines, shall be stated in the same proportion of aided to nonaided miles as though the transportation were over the original line.' Digest Second Comp. Dec. 1160.

"This rule has been uniformly observed in the settlement of accounts for government transportation of property and troops of the United States, and has been applied in the settlement of accounts for transportation rendered the government where through service has been rendered by a shorter line substituted in whole or in part for the longer aided and original line. The accounts for service between St. Paul and the Pacific Coast have been uniformly settled by the government accounting officers for more than 30 years on the basis of the through rates applicable for through service, whether rendered over the original aided line or over the shorter substituted line with the deductions therefrom at the ratio determined in accordance with the original aided mileage, but until shortly prior to the protests of plaintiff set out in the preceding paragraph there were in effect via Brainerd, Minn., and via Duluth, Minn., and via Meeker, Wash., the same through fare from St. Paul to Seattle as via the direct route. The application of the through fare via the longer routes was canceled by the United States Railroad Administration during federal control, and was not in effect at the time the transportation service in question was rendered, and a through fare via these longer routes could be constructed by a combination of local fares only. The combination fares were substantially higher than the through fare applicable over the direct route."

It was not until the transportation of the Marines upon which this suit is based that the railroad made protest against the position taken by the government. The fact that, for a portion of the time, the fare from St. Paul to Seattle was the same by both routes, does not alter the principle. In 1915 the ratio of land grant to total mileage for which the government contends was approved by the railroad through a letter of its comptroller to the Auditor of the War Department. March, 1925, in a hearing before the joint congressional committee on the investigation of the Northern Pacific land grants, counsel for defendant in error made the following statement:

"It is a recognized ruling of the Comptroller's office, acquiesced in by all railroads, that where a land grant route is established and made subject to land grant deductions for the transportation of mails and freight of the government and an alternate route is thereafter established by the same company, that the alternate route is subject to the same land grant deductions as the original, and it is my understanding that that has been enforced uniformly in connection with the Northern Pacific."

The president of the Northern Pacific, at the same hearing, stated the understanding of his road regarding land grant deduction for government transportation to the same effect. These statements were made long after the protests of the road respecting the transportation of these two Marines, to which reference has been made. They are important as evidencing a consistent construction of the obligations of the carrier under the Act of July 2, 1864, by both railroad and government over a long period of years. "The contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous." United States v. Johnston, 124 U. S. 236, loc. cit. 253, 8 S. Ct. 446, 455 (31 L. Ed. 389); United States v. Finnell, 185 U. S. 236, 244, 22 S. Ct. 633 (46 L. Ed. 890); United States v. Sweet, 189 U. S. 471, 23 S. Ct. 638, 47 L. Ed. 907. This rule is reinforced when the opposing party has acquiesced in the construction for a like period.

For the reasons stated, the judgment below is reversed, and the case is remanded for further proceedings in accordance with the views expressed in this opinion.

BOOTH, Circuit Judge (concurring). I concur in the foregoing opinion, and would simply add that the question whether the judgment of the trial court was supported by the stipulated facts has been reviewed by this court pursuant to the rule established in the following cases: Wayne County v. Kennicott, 103 U. S. 554, 26 L. Ed. 486; Lehnen v. Dickson, 148 U. S. 71, 73, 13 S. Ct. 481 (37 L. Ed. 373); Mutual Life Ins. Co. of New York v. Kelly, 114 F. 268 (C. C. A. 8); Hipple v. Bates County, 223 F. 22 (C. C. A. 8); Kirkman v. Farmers' Sav. Bank, 28 F.(2d) 857 (C. C. A. 8); Blair v. United States (C. C. A.) 241 F. 217, 230.

POLLOCK, District Judge (dissenting). I regret my inability to agree with the majority opinion of this court in this case. In

so far as the present case is concerned, the subject-matter, measured in dollars and cents, is most inconsequential. However, the principles involved are of large concern.

The question at issue is this: By what rule is a railway company, aided by a grant of the public domain in its construction, to determine the legal deduction to be made the government for services performed by the road payable by the government? The facts in this case are stipulated by the parties, and are sufficiently stated and found in the able opinion of the trial court and majority opinion of this court, and need no further statement.

When it is considered the land grant made by the government in this case in aid of the construction of the original line of railway from the shores of Lake Superior to the city of Portland, Ore., and Puget Sound, was in no sense of the word whatever a mere gratuity to the railroad, but was more a consideration desired by the government itself than by the railway company undertaking the vast and expansive project, and that when the proposal for this project was declared by the Congress in the Act of July 2, 1864, the terms of which act were accepted by the railway company, the work performed by that company and accepted by the Chief Executive of the nation as having been done and completed, it becomes entirely clear we are in this case dealing with the rights of parties fixed and concluded by the express terms of a definite written contract that must be settled and enforced as written between them when made; that we are not dealing in any haphazard guesses made by either department officials or representatives of the road not charged with the duty of construing this contract. That the above-stated conditions do obtain are to my mind made entirely clear by the decision of the Supreme Court in United States. v. Northern Pacific Railway Co., 256 U. S. 51, 41 S. Ct. 439, 65 L. Ed. 825, wherein Mr. Justice Van Devanter, entirely familiar with existing conditions, in delivering the opinion for the court, stated the facts as follows:

"The purpose of the granting act and resolution was to bring about the construction and operation of a line of railroad extending from Lake Superior to Puget Sound and Portland through what then consisted of great stretches of homeless prairies, trackless forests, and unexplored mountains, and thus to facilitate the development of that region, promote commerce, and establish a convenient highway for the transportation of mails, troops, munitions, and public stores to and from the Pacific Coast, with all the resultant advantages to the government and the public. To that end the act and resolution embodied a proposal to the company to the effect that, if it would undertake and perform that vast work, it should receive in return the lands comprehended in the grant. The company accepted the proposal and at enormous cost constructed the road and put the same in operation, and the road was accepted by the President. Thus the proposal was converted into a contract, as to which the company by performing its part became entitled to performance by the Government. Burke v. Southern Pacific R. R. Co., 234 U. S. 669, 679, 680 [34 S. Ct. 907 (58 L. Ed. 1527)]."

Now, it must be entirely clear, if the deduction to be made the government in this case is not controlled by the terms of the express contract made between the parties, then no rule whatever exists. That the government is by the terms of the contract entitled, when the services for which the government is liable and must pay are performed over a line of road in part constructed through the aid of lands granted by the government, and other part not so aided, the deduction to be made to the government must be calculated by a comparison of the miles of road traveled which were aided in construction by land grant with the number of miles constructed by the railway over which the service is performed without aid by the government. This position is the one for which the road contends in this case, and is in most part conceded by the government itself. Such a rule of construction is plain, and capable of exact application in all cases. To my mind it is the rule applied by the Supreme Court in cases akin to the question involved in this instant case. See U. S. v. Kansas Pacific Railway Co., 99 U. S. 455, 25 L. Ed. 289; United States v. Central Pacific R. Co., 99 U. S. 450, 25 L. Ed. 287, Mr. Justice Bradley delivering the opinion of the court, and United States v. Central Pacific Railroad Co., 118 U. S. 236, 6 S. Ct. 1038, 30 L. Ed. 173, Mr. Justice Woods delivering the opinion for the court.

In harmony with these cases, as I understand them, the trial court held the proper deduction to be made the government in this case was found by applying the rule as above stated, limiting it to what was actually done in performing the services for which the government in this case must pay. In this I think the trial court was fully justified and right. The majority of this court are of the opinion, if the services performed for the

government in this case had been performed in a different manner from what was actually done, which service, no doubt, the railway company would have performed, if it had been requested to so do, that in such case the contention now made by the government would obtain. Undoubtedly the men carried in the military service of the government, being fully informed in making the journey from St. Paul to Seattle, deliberately selected the shorter route over which they actually traveled in perference to the much longer, more difficult, one over which the government, now, when pay day comes, is desirous of making payment because it is a few cents cheaper. If the rule here contended for by the government and upheld by the majority of this court obtains, then, in future, there will be no fixed rule of measurement to apply. The yardstick with which the measuring is done may be either three, or it may be four, feet in length.

Again, while the act of Congress conferring jurisdiction of cases of this nature on the federal courts does ordain the trial shall be before the court without the intervention of a jury, yet no method of procedure at such trial is ordained. Hence the procedure in the court must be the same as in trials before the court wherein a jury is waived. After stating the facts, the trial court in the instant case states as follows:

"Finding the facts to be as herein stated, I reach the conclusion that the plaintiff is entitled to judgment as prayed for, and it is ordered that judgment be entered accordingly. If more specific findings are desired, they may be prepared and presented."

Thereafter, as shown by the record, it is stated:

"The defendant in the action above entitled having requested more specific findings of fact for the purposes of appeal herein, and the parties hereto having entered into a stipulation as to the facts, the court finds the facts to be as stated in the stipulation hereto attached." "As a conclusion of law, the court finds that the plaintiff is entitled to judgment against the defendant for the sum of one dollar and sixty cents ($1.60)."

The record shows no request was made of the trial court to declare the law on the findings made to be in favor of the defendant or different from that which he declared generally for the plaintiff. Even should the trial court have been in error in so declaring the law, what has the government under the settled rule of decision to present to this court?

The assignments of error relied upon to work a reversal of this case are found at page 52 of the record, and are as follows:

"The court erred in the holding that the defendant was not entitled to land grant deduction on the basis of the ratio of land grant mileage to the total mileage of the road as originally constructed from St. Paul, Minn., to Seattle, Wash.

"The court erred in holding that the defendant was required to route its traffic by the longer route over which local service only was maintained in order to secure the benefit of the land grant ratio as established at the time the railroads were constructed from St. Paul to Seattle.

"The court erred in holding that the routes of through trains giving first-class service over the cut-offs and the abandonment of through first-class service over the longer routes required the government to pay for the transportation service on the basis of the route actually traveled.

"The court erred in holding that the procedure established by the accounting officers and followed for many years in the adjustment of plaintiff's accounts on the basis of the ratio of land grant mileage to the total mileage over the routes the plaintiff's lines were originally constructed, regardless of the route over which the transportation was actually effected, should be reversed and set aside.

"The court erred in not dismissing the petition herein and in entering judgment for the plaintiff.

"By reason whereof defendant prays that the judgment aforesaid may be reversed, with costs."

All of these assignments of error relate to the ultimate decision of the trial court. In the early case of Dirst v. Morris, 14 Wall. 484, 20 L. Ed. 722, Mr. Justice Bradley, delivering the opinion for the court, says:

"Had there been a jury, the defendant might have called upon the court for instructions, and thus raised the questions of law which he deemed material. Or had the law, which authorizes the waiver of a jury, allowed the parties to require a special finding of the facts, then the legal questions could have been raised and presented here upon such findings as upon a special verdict. But, as the law stands, if a jury is waived and the court chooses to find generally for one side or the other, the losing party has no redress on error, except for the wrongful admission or rejection of evidence."

In Mercantile Mut. Insurance Co. v. Folsom, 18 Wall. 237, 21 L. Ed. 827, Mr. Justice Clifford, delivering the opinion for the court, says:

"But, where the finding is general, the parties are concluded by the determination of

the court, except in cases where exceptions are taken to the rulings of the court in the progress of the trial. Such rulings, if duly presented by a bill of exceptions, may be reviewed here, even though the finding is general; but the finding of the court, if general, cannot be reviewed in this court by bill of exceptions or in any other manner. Facts found by a jury could only be re-examined under the rules of the common law, either by the granting of a new trial by the court where the issue was tried or to which the record was returnable, or by the award of a venire facias de novo by an appellate court for some error of law which intervened in the proceedings. Nothing, therefore, is open to re-examination in this case except such of the rulings of the court made in the progress of the trial as are duly presented by a bill of exceptions."

In Stanley v. Supervisors of Albany, 121 U. S. 535, 7 S. Ct. 1234, 30 L. Ed. 1000, Mr. Justice Field, delivering the opinion for the court, says:

"Where a case is tried by the court without a jury, its findings upon questions of fact are conclusive here; it matters not how convincing the argument that upon the evidence the findings should have been different."

It is also well settled that a special finding of the facts, in the sense in which that phrase is used in the statute, is not a mere report of all the evidence adduced at the trial, but consists of a statement of the ultimate conclusions of the trial court upon issues of fact raised by the pleadings. Norris v. Jackson, 9 Wall. 125, 19 L. Ed. 608.

In Martinton v. Fairbanks, 112 U. S. 670, 5 S. Ct. 321, 28 L. Ed. 862, Mr. Justice Woods, delivering the opinion for the court, the headnote to this opinion, evidently prepared for the purpose of stating the entire case, reads as follows:

"When there is no demurrer to the declaration, or other exception to the sufficiency of the pleadings, no exception to the rulings of the court in the progress of the trial, in the admission or exclusion of evidence, or otherwise, no request for a ruling upon the legal sufficiency or effect of the whole evidence, or no motion in arrest of judgment, and the only matter presented by the bill of exceptions which this court is asked to review arises upon the exception to the general finding by the court for the plaintiff upon the evidence adduced at the trial, no question of law is presented which this court can review."

In Hinkley v. City of Arkansas City (C. C. A.) 69 F. 768, Judge Thayer, delivering the opinion for the court, said:

"The case having been tried by the Circuit Court without the intervention of a jury, its findings on the issues raised by the pleadings having been general, and no instruction having been asked in the nature of a demurrer to the evidence, we are limited in our consideration of the case to such errors as have been assigned relative to the admission or exclusion of testimony. No other errors that may have been committed by the trial court in the progress of the case are before us for review. Searcy Co. v. Thompson, 13 C. C. A. 349, 66 F. 92."

Such I find to be the conclusively established rule. See Cooper v. Omohundro, 19 Wall. 65, 22 L. Ed. 47, Mercantile Mut. Insurance Co. v. Folsom, 18 Wall. 237, 21 L. Ed. 827, Lehnen v. Dickson, 148 U. S. 71, 13 S. Ct. 481, 37 L. Ed. 373, and many other cases.

As in the case at bar the facts were stipulated by the parties, and no objection to any stipulated fact was taken or exception saved, and as from these findings of fact the court made a general finding that the law was in favor of the plaintiff, and he was not asked to declare the law to be different by any requested declaration of law, in my judgment there is nothing whatever in this case that can be reviewed on this record. The assignments of error do not run to any action of the court, except his act of entering judgment against the defendant. Clearly this, under the cases, is not sufficient.

In Fleischmann Co. v. United States, 270 U. S. 349, 46 S. Ct. 284, 70 L. Ed. 624, Mr. Justice Sanford, delivering the opinion for the court, said:

"The opinion of the trial judge, dealing generally with the issues of law and fact and giving the reasons for his conclusion, is not a special finding of facts within the meaning of the statute. [Louisiana Mut.] Insurance Co. v. Tweed, 7 Wall. 44, 51 [19 L. Ed. 65]; Dickinson v. Planters' Bank, 16 Wall. 250, 257 [21 L. Ed. 278]; Raimond v. Terrebonne Parish, 132 U. S. 192, 194 [10 S. Ct. 57 (33 L. Ed. 309)]; British Mining Co. v. Baker Mining Co., 139 U. S. 222 [11 S. Ct. 523, 35 S. Ct. 147]; York v. Washburn (C. C. A.) 129 F. 564, 566; United States v. [Sioux City] Stock Yards Co. (C. C. A.) 167 F. 126, 127. And it is settled by repeated decisions that, in the absence of special findings, the general finding of the court is conclusive upon all matters of fact, and prevents any inquiry into the conclusions of law embodied therein, except in so far as the rulings during the progress of the trial were excepted to and duly preserved by bill

of exceptions, as required by the statute. Norris v. Jackson, 9 Wall. 125, 128 [19 L. Ed. 608]; Miller v. [Brooklyn L.] Insurance Co., 12 Wall. 285, 300 [20 L. Ed. 398]; Dickinson v. Planters' Bank, supra, 257; [Mercantile Mut.] Insurance Co. v. Folsom, 18 Wall. 237, 248 [21 L. Ed. 827]; Cooper v. Omohundro, 19 Wall. 65, 69 [22 L. Ed. 47]; [Springfield F. & M.] Insurance Co. v. Sea, 21 Wall. 158, 161 [22 L. Ed. 511]; Martinton v. Fairbanks, 112 U. S. 670, 673 [5 S. Ct. 321 (28 L. Ed. 862)]; Boardman v. Toffey, 117 U. S. 271, 272 [6 S. Ct. 734 (29 L. Ed. 898)]; British Mining Co. v. Baker Mining Co., supra, 222; Lehnen v. Dickson, 148 U. S. 71, 73 [13 S. Ct. 481 (37 L. Ed. 373)]; St. Louis v. [Western Union] Telegraph Co., 166 U. S. 388, 390 [17 S. Ct. 608 (41 L. Ed. 1044)]; Vicksburg Ry. v. Anderson-Tully Co., 256 U. S. 408, 415 [41 S. Ct. 524 (65 L. Ed. 1020)]; Law v. United States, 266 U. S. 494, 496 [45 S. Ct. 175 (69 L. Ed. 401)]; Humphreys v. Third National Bank (C. C. A.) 75 F. 852, 855; United States v. [Sioux City] Stock Yards Co., supra, 127. To obtain a review by an appellate court of the conclusions of law a party must either obtain from the trial court special findings which raise the legal propositions, or present the propositions of law to the court and obtain a ruling on them. Norris v. Jackson, supra, 129; Martinton v. Fairbanks, supra, 673. That is, as was said in Humphreys v. Third National Bank, supra, 855, 'he should request special findings of fact by the court, framed like a special verdict of a jury, and then reserve his exceptions to those special findings, if he deems them not to be sustained by any evidence; and if he wishes to except to the conclusions of law drawn by the court from the facts found he should have them separately stated and excepted to. In this way, and in this way only, is it possible for him to review completely the action of the court below upon the merits.' "

As shown by the record in this case, there is nothing possible for this court to review. There is not a single objection found in the record by either party of anything the trial court did or failed to do, and the record is searched in vain for a single exception taken by either party to any act done, finding made, or conclusion reached by the trial court. How, then, can any contention be made by any one the trial court erred. As I understand, the settled rule of this court is as stated by Judge Sanborn in Wear v. Imperial Window Glass Co., 224 F. 60, as follows:

The question of law whether or not there was any substantial evidence to sustain any such finding is reviewable, as in a trial by jury, only when a request or a motion is made, denied, and excepted to, or some other like action is taken which fairly presents that question to the trial court and secures its ruling thereon during the trial. United States Fidelity & Guaranty Co. v. Board of Com'rs, 145 F. 144, 150, 151, 76 C. C. A. 114, 120, 121, and cases there cited; Mercantile Trust Co. v. Wood, 60 F. 346, 348, 349, 8 C. C. A. 658, 660, 661; Barnard v. Randle, 110 F. 906, 909, 49 C. C. A. 177, 180; Barnsdall v. Waltemeyer, 142 F. 415, 417, 73 C. C. A. 515, 517; Bell v. Union Pacific R. Co., 194 F. 366, 368, 114 C. C. A. 326, 328; Seep v. Ferris-Haggarty Copper Min. Co., 201 F. 893, 894, 895, 896, 120 C. C. A. 191, 192, 193, 194; Pennsylvania Casualty Co. v. Whiteway, 210 F. 782, 784, 127 C. C. A. 332, 334.

"There is another reason why no reviewable question of law is presented to this court in this case. A trial court is entitled to a clear specification by exception of any ruling or rulings which a party challenges and desires to review, to the end that the trial court itself may correct them if so advised, and, if it fails to do so, that there may be a clear record of the rulings and the challenges thereof. For this purpose a rule has been firmly established that an exception to any ruling which counsel desire to review, which sharply calls the attention of the trial court to the specific error alleged, is indispensable to the review of such a ruling. Block v. Darling, 140 U. S. 234, 11 S. Ct. 832, 35 L. Ed. 476; Webb v. National Bank of Republic, 146 F. 717, 719, 77 C. C. A. 143; Union Pacific R. R. Co. v. Thomas, 152 F. 365, 372, 81 C. C. A. 491, 498; Armour Packing Co. v. United States, 153 F. 1, 16, 82 C. C. A. 135, 150, 14 L. R. A. (N. S.) 400."

This was also the holding of this court in the recent case of McFarland, County Treasurer, et al. v. Central National Bank of Topeka, 26 F.(2d) 890, and the more recent cases are therein cited, to wit: United States v. Atchison, T. & S. F. R. Co. (C. C. A.) 270 F. 1, 3, 4; Denver Live Stock Com. Co. v. Lee (C. C. A.) 18 F.(2d) 11, 14, 15; Id. (C. C. A.) 20 F.(2d) 531; Southern Surety Co. v. United States (C. C. A.) 23 F.(2d) 55.

Again, much is said in the majority opinion as to the rulings of department officials made on this question at issue, and as to statements said to have been made by officers of the railway at different times. However, it must be remembered the question here presented arises over a written contract entered

into between the railway company and the government. What the parties are bound by is the true construction of the terms of this written contract, and not by what some one, whether an official of the government or an employee of the road, believed. Burke v. Southern Pacific R. Co., 234 U. S. 669, 34 S. Ct. 907, 58 L. Ed. 1527.

To my mind, the decision of the learned trial court was right, cannot be reviewed on this record, and, being right, should be affirmed.