## SOUTHERN PACIFIC CO. v. UNITED STATES.

No. 613. Argued March 29, 1939.—Decided May 29, 1939.

*Mr. James R. Bell* for petitioner.

*Assistant Attorney General Whitaker,* with whom *Solicitor General Jackson,* and *Messrs. Paul A. Sweeney, Warner W. Gardner,* and *Aaron B. Holman* were on the brief, for the United States.

MR. JUSTICE REED delivered the opinion of the Court.

This case involves the right of the Government to deduct from the public terminal-to-terminal tariffs of a railroad over a route, partly of land-grant aided mileage, identical with part of the mileage of another earlier constructed route of the same road between the same terminals, sums based upon the higher proportion of land-grant aided mileage in this latter route. On account of the importance of the question in administration, certiorari was granted.[1]

The carrier owns and operates two lines of railroad between Portland, Oregon, and Roseville, California, and Davis, California, both southern points being on the Central Pacific, now the Southern Pacific, Railroad in California. From the California junctions, there is direct connection over the same Southern Pacific rails into San Francisco. The older line is called the Siskiyou, the newer the Cascade Route. For a considerable portion of the distance between Portland and San Francisco, the two routes are identical. There are two differences; one is between Eugene, Oregon, and Black Butte, California. On

[1] Cf. Schedule of Land Grant and Bond-Aided Railroads of the U. S., Office of the Quartermaster General of the Army, Circular No. 4, February 1, 1922. This shows the land-grant mileage in the United States at the date of issue. In order to obtain a share of government traffic, non-land-grant roads have entered widely into freight land-grant equalization agreements by which they agree to carry freight, routed over their lines at "the lowest net rates lawfully available, as derived through deductions account of land grant distance. . . ." Cf. Circular 3, Feb. 6, 1935, Office of Quartermaster General, War Department, Freight Land Grant Equalization Agreements.

the west the Siskiyou Route passes through Grant's Pass and Siskiyou, a distance of 300 miles, to connect Eugene and Black Butte. The eastern, or Cascade Route, joins the same two points by a shorter (275 miles) line through Natron and Klamath Falls. The second deviation is between Tehama, California, and Davis and Roseville respectively. Here the Siskiyou Route is to the east, 104 miles long, and the Cascade Route to the west, 110 miles.

Where the routes are identical, some of the mileage is land-grant aided. Some is not. The mileage of the Siskiyou which is different from the Cascade is largely land-grant aided. None of the Cascade Route, except where it uses the same rails as the Siskiyou, has land grants. Based on the proportion of aided mileage and the percentage of deduction allowed to the Government from the tariffs charged private shippers, the United States, between San Francisco and Portland, is entitled to a land-grant deduction via the Siskiyou Route of 42.792 per cent. Via the Cascade Route, the deduction is 17.801 per cent. There are slight variations for East Portland.

During December, 1931, and January, 1932, the carrier transported, in both directions, certain property of the United States on Government bills of lading from Portland or East Portland to San Francisco. No directions were given by the Government as to the routes over which the shipments were to move. While before November 11, 1931, the terminal-to-terminal rates over the two routes were the same, after that date authorized revisions resulted in a rate competitive with water borne commerce over the Cascade and a higher rate over the Siskiyou. These public tariffs were so much lower over the Cascade than they were over the Siskiyou Route, that the net cost to the Government, after the deductions,

deemed applicable by the railroad, was less over the Cascade than it was over the Siskiyou, despite the higher percentage of deduction allowed the latter route.

The Government was billed on the Cascade tariffs with deductions for land-grant mileage of about 17 per cent. It paid on the basis of the Cascade tariffs but deducted on the ratio of the land-grant to total miles between the terminals on the Siskiyou Route, or some 42 per cent. The Government claims that it is entitled to the lowest rate, between the terminals, less the percentage of deduction over the original land-grant aided route. The carrier protested and brought this action in the Court of Claims to recover the difference between the Cascade tariffs less the Cascade ratio of land-grant mileage and that paid by the Government, the Cascade tariffs less the Siskiyou ratio. The Court of Claims, after making special findings of fact, adjudged that the carrier was not entitled to recover and dismissed its petition.

The Government obtained concessions from the established tariffs by virtue of the acceptance by the carrier of grants of land, ten alternate sections per mile on each side of the line, to aid in the construction of a railroad as described in the statute authorizing the conveyance.[2] This statute was similar in form to the land grant construed in *Burke* v. *Southern Pacific R. Co.*[3] and upon compliance with its requirements became a contract, "obligatory on both"[4] the carrier and Government. The carrier agreed it should "be and remain a public highway for the use of the government of the United States, free of all toll or other charges upon the transportation of the property or troops of the United States; and the same shall be transported over said road at the cost, charge,

---

[2] Act of July 25, 1866, c. 242, 14 Stat. 239.

[3] 234 U. S. 669.

[4] *Id.* 680; cf. *United States* v. *Central Pacific R. Co.*, 118 U. S. 235, 238.

and expense of the corporations or companies owning or operating the same, when so required by the government of the United States." The authorization was "to lay out, locate, construct, finish, and maintain a railroad and telegraph line between the city of Portland, in Oregon, and the Central Pacific Railroad, in California, . . ." The road was located in accordance with these requirements.

In December, 1887, the Siskiyou Route was finished. The road running from its southern terminus at Roseville, to San Francisco had been finished in 1870. This gave a through route from San Francisco to Portland, 774.16 miles long with 663.16 land-grant aided. The Cascade Route was built later in small sections primarily for local service or links in other projected distinct railroad undertakings. The California deviation from the Siskiyou between Tehama and Davis was finished in 1882. The Oregon section, forming with that portion of the Siskiyou an irregular ovoid figure, was put together between 1905 and 1926, being completed September first of the latter year. This route is 725.03 miles between Portland and San Francisco with 258.13 miles built with grants in aid. Each route is necessary for adequate transportation service to the areas traversed. At the time of the completion of the Cascade and until November 10, 1931, the tariffs over the two routes between the terminals were the same.

On May 23, 1928, there was enacted an act for the relief of the land-grant railroad operated between East Portland, Oregon, and Roseville, California.[5] As Rose-

---

[5] The Act of May 23, 1928, c. 720, 45 Stat. 722–723, provides:

"Chap. 720.—An Act For the relief of the land-grant railroad operated between the station formerly known as East Portland, in the State of Oregon, and Roseville, in the State of California.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the land-grant railroad heretofore operated, and now being operated, between the station formerly known as East Portland, in the State of Oregon, and Roseville, in the State of California, shall hereafter receive compensa-

ville is the junction terminal of the Siskiyou and is not served by the Cascade, this description covers only the Siskiyou line built under the 1866 act. By its terms, the Government relinquished its privilege of free transportation and accepted in lieu thereof a right to the same rate as is paid to other land-grant roads. This is fifty per cent of the public tariff for land-grant aided mileage.[6]

The Act of 1866, granting the aid, specified, only generally, the route of the new road. It was to begin at some point on the Central Pacific Railroad in the Sacramento Valley and thence run northerly to Portland. By the grant of millions of acres of public lands, the Government prepaid for transportation [7] over the line, wherever it might be built. It was entitled to service for its property or troops without further cost from whosoever owned or operated the aided facility between the Central Pacific and Portland.[8] By the 1928 act, the Government agreed, for the "relief of the land-grant" road, to put it upon the same basis as other land-grant roads. By this concession, no change was made in the extent of the obligation to give land-grant service.

The two acts are quite clear in their requirement that the company which constructed the road or its successors in ownership or operation should transport the property

tion for transportation of property and troops of the United States at the same rate as is paid to land-grant railroads organized under the Land Grant Act of March 3, 1863, and the Act of July 27, 1866 (chapter 278): *Provided,* That the Congress hereby reserves the right at any time by law to prescribe such charges as it deems advisable for such Government transportation."

[6] *Lake Superior & M. R. Co.* v. *United States,* 93 U. S. 442, 454, 455; *Louisville & N. R. Co.* v. *United States,* 273 U. S. 321, 323. Act of June 7, 1924, c. 291, 43 Stat. 477, 486. This act determined the proportion of the regular tariff to be paid for the transportation.

[7] *Louisville & N. R. Co.* v. *United States,* 267 U. S. 395, 402.

[8] § 5, Act of July 25, 1866, 14 Stat. 240.

or troops of the United States over the railroad at the
rate fixed by their provisions. The uncertainty as to the
meaning arises in the application of the right of trans-
portation to the mileage. On completion of the original
project between Portland and the Central Pacific, there
was a definite right of way, the present Siskiyou Route,
with every mile between East Portland and the Central
Pacific aided by land grants. This same situation existed
as to all or parts of other bond or land aided roads.[9]

[9] The laws relating to land-grant and bond-aided railroads contain
several types of conditions. The most prevalent condition was that
"the said railroad shall be and remain a public highway for the use
of the Government of the United States, free from toll or other charge
upon the transportation of any property or troops of the United
States." This was construed to require the railroad to furnish only
free use of the rails and permanent structures. *Lake Superior &
M. R. Co.* v. *United States,* 93 U. S. 442. It is to be found in the
following acts: Act of Sept. 20, 1850, 9 Stat. 466 (Ill. Cent. R. R.;
Mobile & O. R. R.); Act of June 10, 1852, 10 Stat. 8 (Chicago, B. &
Q. R. R.; Missouri Pac. Ry.; St. Louis & S. F. Ry.); Act of Feb. 9,
1853, 10 Stat. 155 (Chicago, R. I. & Pac. Ry.; St. Louis, Iron Mtn. &
So. Ry.); Act of May 15, 1856, 11 Stat. 9 (Chicago & N. W. Ry.;
Chicago, B. & Q. R. R.; Chicago, M. & St. P. Ry.; Chicago, R. I. &
Pac. Ry.); Act of May 17, 1856, 11 Stat. 15 (Louisville & N. R. R.;
Seaboard Air Line Ry.); Act of June 3, 1856, 11 Stat. 17, 18, 20, 21
(Ala. Great So. R. R.; Central of Ga. Ry.; Chicago & N. W. Ry.;
Chicago, M. & St. P. Ry.; Chicago, St. P., M. & O. Ry.; Duluth, So.
Shore & At. Ry.; Grand Rapids & Ind. R. R.; Grand Trunk R. R.;
N. Y. Cent. R. R.; Louisville & N. R. R.; Mich. Cent. R. R.; Mis-
souri, Kan. & Texas Ry.; Nashville, C. & St. L. Ry.; Pere Mar-
quette R. R.; Southern Ry. Co.; Vicksburg, S. & Pac. R. R.); Act
of Aug. 11, 1856, 11 Stat. 30 (Ala. & Vicksburg Ry.; Gulf & Ship
Id. R. R.); Act of March 3, 1857, 11 Stat. 195 (Chicago & N. W.
Ry.; Chicago, M. & St. P. Ry.; Chicago, St. P., M. & O. Ry.; Great
No. Ry.; Northern Pac. Ry.); Act of March 3, 1863, 12 Stat. 772
(Atchison, T. & S. F. Ry.; Missouri, Kan. & Texas Ry.); Act of May
5, 1864, 13 Stat. 64 (Northern Pac. Ry.); Act of May 5, 1864, 13 Stat.
66 (Minneapolis, St. P. & S. Ste. Marie Ry.); Act of May 12, 1864,
13 Stat. 72 (Chicago, M. & St. P. Ry.); Act of March 3, 1865,

Soon there were changes and shortening of these lines.
The Government was faced with the problem of the
proper ratio of land-grant or bond-aided deductions or
allocations to be applied where new non-aid mileage is
used between terminals formerly served in a higher pro-
portion by land-grant mileage. Cut-offs and the elimina-
tion of curves furnished occasion for these decisions. Thus
in 1888 in a ruling as to transportation services rendered
by the Central Pacific Railroad, where the Central had
three lines from Sacramento to San Francisco, with vary-
ing bond-aided mileages, the Comptroller of the Treasury
ruled, when the road sought to render statements for the
line actually used, that all United States accounts should
be stated in terms of the bond-aided mileage of the orig-
inal route. As the amounts due to the carrier were ap-
plied to retirement of the bonds in aid, this ruling pre-
served the charges for this purpose. This ruling has been

13 Stat. 526 (Chicago & N. W. Ry.; Chicago, M. & St. P. Ry.;
Great No. Ry., Northern Pac. Ry.). Some of the grants went fur-
ther and required the railroad to furnish free transportation. Act of
July 1, 1864, 13 Stat. 339 (Missouri, Kan. & Texas Ry.); Act of July
3, 1866, 14 Stat. 78 (N. Y. Cent. R. R.; Mich. Cent. R. R.); Act of
July 4, 1866, 14 Stat. 87 (Chicago, M. & St. P. Ry.); Act of July 25,
1866, 14 Stat. 239 (Southern Pac. Co.); Act of July 26, 1866, 14
Stat. 289 (Missouri, Kans. & Texas Ry.); Act of July 28, 1866, 14
Stat. 338 (Chicago, R. I. & Pac. Ry.; St. Louis, Iron Mtn. & So.
Ry.). Others authorized the railroad to charge for Government trans-
portation, subject to regulations which Congress might impose re-
stricting such charges. Act of July 2, 1864, 13 Stat. 365 (Northern
Pac. Ry.); Act of July 27, 1866, 14 Stat. 292 (Atchison, T. & S. F.
Coast Lines; St. Louis & S. F. Ry.; Southern Pac. Co.); Act of
March 3, 1871, 16 Stat. 573 (Southern Pac. Co.). The Act of July 1,
1862, 12 Stat. 489 (Missouri Pac. Ry.), provided for fair and reason-
able rates for Government transportation, not to exceed the amounts
paid by private parties for the same kind of service. See Schedule
of Land-Grant and Bond-Aided Railroads of the U. S., Office of
the Quartermaster General of the Army, Circular No. 4, February 1,
1922.

followed in roads aided by land grants.[10]. The long continued administrative interpretation has decided weight in reaching a conclusion upon the construction of this contract,[11] particularly when the Congress after such interpretation gives up a right for free transportation between the terminals. Any doubt must be resolved in favor of the Government.[12]

The construction adopted in the Court of Claims was reached in *United States* v. *Northern Pacific Ry. Co.*[13] where there was a shortening of 94.24 miles in the through route between St. Paul and Seattle by means of a cut-off. In that case, too, the old route was maintained for local use.

It is urged, however, that in this instance we have a new line, an addition, rather than a cut-off in or a shortening or straightening of an original line.[14] So far as terminal-to-terminal transportation is concerned, the Cascade Route does not function as a new line or an addition. It is simply another way of carrying goods by the same railroad between San Francisco and Portland. By which route the shipment moves, is immaterial on the question of deduction for land grants. The conclusion that the lowest public tariffs are to have land-grant deductions

---

[10] (1888) 3 Dig. Dec. 2d Comp. 299. Followed in (1899) V Dec. of Comp. of Treas. 364; (1911) XVII Dec. of Comp. of Treas. 633; (1914) XXI Dec. of Comp. of Treas. 238; (1917) XXIV Dec. of Comp. of Treas. 193; (1923) 3 Dec. of Comp. Gen. 267; (1931) 10 Dec. of Comp. Gen. 552; (1936) 15 Dec. of Comp. Gen. 614. But see (1900) VII Dec. of Comp. of Treas. 224; (1902) VIII Dec. of Comp. of Treas. 474.

[11] Cf. *Fox* v. *Standard Oil Co.*, 294 U. S. 87, 96; *Armstrong Paint & Varnish Works* v. *Nu-Enamel Corp.*, 305 U. S. 315, 329–30.

[12] *Broad River Co.* v. *South Carolina*, 281 U. S. 537, 548.

[13] 30 F. 2d 655; rehearing denied, 32 F. 2d 698.

[14] *United States* v. *Kansas Pacific Ry. Co.*, 99 U. S. 455; *United States* v. *Denver Pacific Ry. Co.*, 99 U. S. 460; *United States* v. *Central Pacific R. Co.*, 118 U. S. 235,

based upon the proportion of the land-grant mileage in the original line, seems consonant with the purpose of the acts.

*Affirmed.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE BUTLER, dissenting.

The land-grant Act of July 25, 1866, and compliance with it constitute a contract.[1] This case calls for construction of a provision in § 5.[2] The Court of Claims sustained the government's deduction on account of land-grant mileage that is not included in or possibly attributable to the railroad over which the shipments moved. The inclusion, as a part of the aided railroad, of 275.6 miles of the Cascade Route between Springfield Junction, Oregon and Black Butte, California, is not permissible

---

[1] *Lake Superior & M. R. Co.* v. *United States,* 93 U. S. 442. *Union Pacific R. Co.* v. *United States,* 104 U. S. 662, 664. *United States* v. *Central Pacific R. Co.,* 118 U. S. 235, 238. *Burke* v. *Southern Pacific R. Co.,* 234 U. S. 669, 680. *United States* v. *Northern Pacific Ry. Co.,* 256 U. S. 51, 64. *United States* v. *Galveston, H. & S. A. Ry. Co.,* 279 U. S. 401.

[2] *"And be it further enacted,* That the grants aforesaid are made upon the condition that the said companies shall keep said railroad . . . in repair and use, and shall at all times transport the mails upon said railroad . . . for the government of the United States, when required so to do by any department thereof, and that the government shall at all times have the preference in the use of said railroad . . . therefor at fair and reasonable rates of compensation, not to exceed the rates paid by private parties for the same kind of service. And said railroad shall be and remain a public highway for the use of the government of the United States, free of all toll or other charges upon the transportation of the property or troops of the United States; and the same shall be transported over said road at the cost, charge, and expense of the corporations or companies owning or operating the same, when so required by the government of the United States." 14 Stat. 239, 240–241.

under the terms of the contract, nor is computation of the land-grant deduction from charges for transportation via Cascade on the percentage applicable to charges for transportation via Siskiyou warranted by constructions heretofore put upon like Acts. See (opposite) reproduction of map submitted as an exhibit at the argument in this Court.

## I.

The grant was made to induce and aid construction of a railroad between Portland and some point to be selected by the grantees on the Central Pacific to serve the Willamette, Umqua, and Rogue River Valleys in Oregon, and the Sacramento and Shasta Valleys in California, and to be located as shown on maps made by the grantees and filed with the Secretary of the Interior. The railroad was located and constructed, and, since its completion in 1887, has been maintained and kept in use, in accordance with the contract. The aided portion is 663.13 miles long, extending between East Portland, Oregon and Roseville, California, a point on the Central Pacific east of Sacramento and about 111 miles from San Francisco. It is now called the Siskiyou Route.

Section 5 declares that the grantees shall keep "said railroad" in repair and use; that it shall be "a public highway" for the use of the United States; and that property and troops of the United States shall be transported over "said road" at the cost, charge, and expense of the corporations or companies owning or operating "the same," when so required by the Government.

Plainly the contract applies only to the land-aided railroad between Portland and Roseville; not to the haul between Portland and San Francisco, nor to that between Roseville and San Francisco. The contract neither expresses nor implies any special undertaking by the carrier as to charges for government transportation be-

tween the port or terminal of Portland and that of San Francisco.

The Act of May 23, 1928 [3] merely substitutes 50 per cent of the commercial charges for free transportation under § 5. Thus, as modified, the Act of 1866 requires plaintiff to furnish government transportation between points on and wholly via the land-grant railroad for one-half the charges applicable to like service for private parties. And for government transportation between a point on the aided railroad and one on another line there is deducted from charges generally made one-half the percentage that aided mileage attributable to that service is of the total miles hauled.

The Cascade stretch was not completed until 1926 and, as shown by the findings, it is made up of branches extended during a number of years prior to 1912 little by little from Black Butte to Kirk to reach productive forest and agricultural areas. See Diagram 1, opposite. At its northerly end a short piece from Springfield Junction to Natron was completed in 1891; in 1912 that branch was built to Oakridge to serve timber areas on both sides of the Cascades and ultimately to be a part

---

[3] "An Act For the relief of the land-grant railroad operated between the station formerly known as East Portland, in . . . Oregon, and Roseville, in . . . California. *Be it enacted* . . . That the land-grant railroad heretofore operated, and now being operated, between the station formerly known as East Portland, in . . . Oregon, and Roseville, in . . . California, shall hereafter receive compensation for transportation of property and troops of the United States at the same rate as is paid to land-grant railroads organized under the Land Grant Act of March 3, 1863, and the Act of July 27, 1866 (chapter 278) [pursuant to which such railroads transport government property at a charge of 50 per cent of the regular tariffs]: *Provided,* that the Congress hereby reserves the right at any time by law to prescribe such charges as it deems advisable for such government transportation."

Diagram 1.
Hatched Lines Show Land-aided Mileage.

of a line connecting with the Central Pacific in Nevada or with the Union Pacific in eastern Oregon. These systems were then under one control. About the same time—1911–1914—plaintiff built from Fernley, Nevada, a point on the Central Pacific, northwesterly to Westwood, California to serve industries there. Consummation of the project to complete the line between Fernley and Springfield Junction via Natron, Oakridge, Kirk, and Klamath Falls was delayed because of the suit brought in 1908 under the Sherman Anti-Trust Act by the United States in the circuit court for the district of Utah (see 188 F. 102), which resulted in decree dissolving control by the Union Pacific of the Southern Pacific. *United States* v. *Union Pacific R. Co.*, 226 U. S. 61. In 1929, with the approval of the Interstate Commerce Commission, plaintiff completed the connection between Springfield Junction and Fernley to form a part of the through route between Portland, Salt Lake City, and points east.

The Court of Claims found that since the completion of the Cascade stretch "plaintiff has had and now has two complete lines of railroad or routes in Oregon and northern California, one the Siskiyou route . . . serving the valleys and areas described . . . producing much tonnage of timber, agricultural products, livestock, etc., and the other the Cascade route . . . also serving large timber areas and agricultural and livestock producing areas, each of these lines of railroad serving producing areas quite generally at all points. Plaintiff has maintained the Siskiyou route, transporting a substantial and varied traffic and serving a large and important area. The Siskiyou route and the Cascade route are two separate and distinct routes or lines of railroad, necessary for adequate transportation service to the interested areas or territories traversed by such lines."

The stretch of railroad between Springfield Junction and Black Butte via Siskiyou, all land-aided, is 300.42 miles long; it is used for through transportation and also serves locally in the Willamette, Umqua, and Rogue River Valleys. All land-aided mileage in that route continuously has been operated and maintained for the service of the public, including transportation of property and troops of the United States. The stretch between the same points via Cascade, none of it land-aided, is 275.6 miles long, most of which is east of the Cascade Mountains. It also carries through and local traffic. To illustrate how unreasonable and arbitrary it is to attribute that mileage to the aided railroad built, as required by the Act of 1866, to open and develop the great valleys west of the mountains, let it be noted that except at and near the connecting points, Springfield Junction and Black Butte, these stretches serve widely separated territories of vast extent; the area between them is greater than that of the State of Massachusetts. The mileage of the Cascade stretch is greater than the distance between Washington and West Point via New York City. The mileage of the Siskiyou stretch is substantially the same as the distance between Washington and Pittsburgh.

Upon completion of the Siskiyou Route, plaintiff established through rates between Oregon and California points; in order to meet competition of water carriers, it was compelled to make rates between Portland and San Francisco lower than rates between intermediate points. In 1912, after enactment of the long and short haul clause of § 4, Interstate Commerce Act, the Commission permitted the maintenance of lower through rates; it found they were forced by water competition and were lower than normal, fair and reasonable rates. In 1920, § 4 was again amended to require the Commission to find that the lower through rates permitted by it were reasonably com-

pensatory. In 1927, the Commission, upon plaintiff's showing of operating costs on the Siskiyou Route, found that the through rates were less than reasonable and granted authority to establish rates between the terminals lower than intermediate rates but so much higher than the competing water rates that plaintiff could not share in the business. The Commission thereafter reopened the case. In order to show the reasonably compensatory nature of the lower through rates, plaintiff based its showing on the more favorable transportation conditions and substantially lower operating costs on the Cascade Route. Pursuant to the Commission's report and order of July, 1930, the plaintiff revised its tariffs effective November 11, 1931. The low through rates on the Siskiyou Route were discontinued and higher rates in accord with § 4 were substituted. Much lower rates, to meet water competition, were established via the Cascade Route as to transportation of about 25 per cent of all articles that move between the cities of Portland and San Francisco. During the period between completion of the Cascade Route and the effective date of the new rates, the through rates were the same via both routes.

The aided mileage in the Siskiyou Route, 663.16 miles, between Portland and San Francisco, is 85.584 per cent of the total. The aided mileage in the Cascade Route is 258.13 miles, or 35.602 per cent of the total. Charges for the shipments in question applicable via the Cascade Route, less 17.801 per cent (one-half of the per cent of land-grant mileage to total) are substantially less than those via Siskiyou, less 42.792 per cent. The Government did not expressly direct the shipments in question to be hauled over the Cascade Route but it did in fact choose to have them go that way. It was plaintiff's duty to send them over the route on which the charges would be lower. The Government refused to pay more than

the lower rates applicable via Cascade minus the land-grant deduction of 42.792 per cent applicable to the higher charges over the Siskiyou Route.

The findings compel the conclusions that the Cascade stretch between Springfield Junction and Black Butte was not built to better alignment or lessen grades of, add trackage to or otherwise improve, the land-aided stretch via Siskiyou between the same points; that it was made up of branches and extensions constructed from time to time to develop productive areas, to serve local needs and, upon completion, to be a separate and distinct railroad between Springfield Junction and Black Butte, a part of which was also to serve as a section of the transcontinental route above referred to. Clearly it is not a part of the railroad aided by the grant of 1866. It was not constructed to aid transportation on, or as a substitute for, any part of the aided railroad. The fact that it is used to haul government shipments like those in question does not suggest any failure of plaintiff fully to perform the land-grant contract to maintain and keep in use the aided railroad between Portland and Roseville. There is nothing in the grant, or in the circumstances under which it was made and complied with, that gives any support to the government's claim that, from the lower charges applicable to shipments by private parties via Cascade, it is entitled to deduct the higher land-grant percentage applicable to transportation via Siskiyou.

II.

The opinion of the Court of Claims shows its judgment to have been reached on an assumption of fact that is not sustained by the findings or otherwise supported. It says: "The method of settlement with plaintiff used by the General Accounting Office in this case has been consistently and uniformly followed by the defendant's ac-

counting officers for more than fifty years in cases involving the same or similar questions."

There is no finding to that effect, but to support the statement the opinion continues: "The principle was stated by the Second Comptroller of the Treasury in a decision April 17, 1888, as follows: 'If a railroad have a line between two points, aided in whole or in part, and subsequently acquire a new line or lines nonaided between those same points, the accounts for Government transportation, when performed over the new line or lines, shall be stated in the same proportion of aided to nonaided miles as though the transportation were over the original line.'"

The decision referred to has not been reported or anywhere published. It may be found on file in the General Accounting Office, Miscellaneous Claims Division, Vol. 55, p. 422. The passage above-quoted is one of two sentences excerpted from different parts of the document and together published, without more, as paragraph 1160, Vol. 3, p. 299 of Kern's 1893 Digest of Decisions of the Second Comptroller of the Treasury.[4] As counsel failed to make available to us the unreported text of the decision, it is assumed that nothing more than the statement in the Digest was brought to the attention of the lower court.

To give weight to the Second Comptroller's dictum and justify its application to this case, the lower court adds: "This rule as stated has been uniformly observed in the settlement of accounts for government transportation of property and troops of the United States, and has been applied in settlement of accounts for transportation ren-

---

[4] The first sentence reads: "The Central Pacific Railroad Company should recognize the Government's demand that its security for repayment of money advanced in aid of the construction of the original line be not impaired or whittled away by a duplicating of the line."

dered the Government where through service has been rendered by a shorter line substituted in whole or in part for the longer aided and original line. (See stipulations of the parties in *United States* v. *Northern Pacific Ry. Co.*, 30 F. 2d 655.) This long established rule has been acquiesced in by land-grant railroads generally and was acquiesced in by this plaintiff during the period between the completion of its Cascade line in 1926 to 1931 when its accounts against the Government for the transportation of Government property were settled in this manner. It was not until the shipments involved in this suit were moved that plaintiff made protest against the position of the Government. We do not regard the fact the rates between San Francisco and Portland were the same over both routes between 1926 and 1931 as material or altering in any way the principle involved."

As to that passage, it is to be observed:

The opinion states that the rule, said to have been established by administrative practice, has been applied to transportation rendered by a "shorter line substituted in whole or in part for the longer aided and original line." The court definitely found that the Cascade stretch is a line separate and distinct from the aided railroad. It was not substituted for or used in lieu of the Siskiyou Route. It was chosen by or for the Government because applicable charges, whatever the basis of calculation of land grant deductions, were less than those for like transportation via the other stretch.

The cited stipulation between the Northern Pacific Railway and the United States cannot here be made to serve in lieu of special findings of fact.[5] Moreover, as

---

[5] See *M. E. Blatt Co.* v. *United States*, 305 U. S. 267, 277. *Stone* v. *United States*, 164 U. S. 380, 383. *Crocker* v. *United States*, 240 U. S. 74, 78. *Brothers* v. *United States*, 250 U. S. 88, 93. *United States* v. *Wells*, 283 U. S. 102, 120. *United States* v. *Esnault-Pelterie*, 299 U. S.

will be shown, the circuit court of appeals in that case held against the carrier on the ground that new unaided mileage had been substituted for aided mileage in the original route. That case makes strongly in favor of plaintiff here, for the findings of the Court of Claims show that no part of the original aided railroad had been abandoned as to the traffic in question or otherwise.

The lower court's statement that, from the completion of the Cascade stretch in 1926 until the shipments here involved, plaintiff acquiesced in the rule adopted by the court is not supported by the findings. But, even if warranted, it is without significance for the question presented in this case did not and could not arise while the rates applicable between Portland and San Francisco were the same.

## III.

The Court of Claims failed to find as fact that the Government followed, or the carriers accepted as sound, the dictum excerpted by Kern from the decision of the Second Comptroller of April 17, 1888. To supply the omission, the Government cites in its brief, without adequate statement of the facts or explanation, all administrative rulings and judicial decisions it deems to have any bearing on the question now before us. The former are referred to in footnote 10 of this Court's opinion.[6] Here the material substance of each will be indicated.

---

201, 206. And see *American Propeller Co.* v. *United States,* 300 U. S. 475, 479–480.

[6] The footnote reads: "(1888) 3 Dig. Dec. 2d Comp. 299. Followed in (1899) V Dec. of Comp. of Treas. 364; (1911) XVII Dec. of Comp. of Treas. 633; (1914) XXI Dec. of Comp. of Treas. 238; (1917) XXIV Dec. of Comp. of Treas. 193; (1923) 3 Dec. of Comp. Gen. 267; (1931) 10 Dec. of Comp. Gen. 552; (1936) 15 Dec. of Comp. Gen. 614. But see (1900) VII Dec. of Comp. of Treas. 224; (1902) VIII Dec. of Comp. of Treas. 474."

1. Ruling of April 17, 1888, by Second Comptroller of the Treasury, Butler. At that time, the Central Pacific had three lines between Sacramento and San Francisco. They are indicated on Diagram 2, opposite. Route 1, via Brighton, Tracy and Niles was the original railroad, 140 miles, of which 103 were bond-aided. Route 2 via Davis and Port Costa, 90 miles, had no aided mileage. Route 3 via Brighton, Tracy, and Port Costa was 151 miles, of which 63 belonged to the bond-aided stretch in Route 1. The bonds in aid were given under the Act of July 1, 1862, c. 120, 12 Stat. 489, 494. See also amendatory Acts of July 2, 1864, c. 216, 13 Stat. 356, and May 7, 1878, c. 96, 20 Stat. 56. Section 6 declares that the aid grants are made on condition that the company shall keep the railroad in repair and use, transport troops and property of the Government "at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service," and that all compensation for that transportation shall be applied to the payment of the bonds. For a time immediately preceding the Second Comptroller's decision, the Government stated the accounts of the company as though all shipments had been hauled over Route 1. The railroad maintained that payment should be made in accordance with the bond-aided mileage in the route used. Thus arose the issue decided.

The bond-aid contract had been construed to require the Treasury to retain the compensation for government transportation over bond-aided mileage and to apply it in payment of the bonds. *United States* v. *Kansas Pacific Ry. Co.*, 99 U. S. 455. *United States* v. *Central Pacific R. Co.*, 118 U. S. 235. These cases definitely established that compensation for government transportation over nonaided extensions of the aided railroads should not be withheld or applied to pay the bond debt. But the Sec-

## DIAGRAM 2.

*Scale:* **Appx. 1 inch = 12 miles.**

Hatched Lines Show Bond-aided Mileage

ond Comptroller held that rule not applicable. He found that accounting officers were required by the Act to determine whether the rates are "fair and reasonable" and stated the problem thus: "Given a certain state of facts, what is the service rendered by the railroad, and what is a fair and reasonable compensation therefor?"

More specifically to disclose the point, the Second Comptroller referred to the contractual relations between the Government and the carriers, and asked himself: "Are those relations impaired by the railroad, if it pursues the course which in the present case it contends to be right?" He answered affirmatively and to sustain that view reasoned as follows: To reimburse itself the Government may withhold compensation for "carriage over an aided line." The security is impaired if the railroad "parallels or duplicates an aided line between two points and diverts the government business to that line without in some way recognizing its indebtedness to the government." [7]

Then, granting that on strictest legal construction of the statutes and of the decisions of this Court there was nothing to preclude such a course by the railroad, the Second Comptroller went on to say: "But the principles of equity and ethics forbid the application of such a construction." Invoking the maxim "He that seeks equity must do equity" as being "most forcibly pertinent," he declared that so long as the railroad is indebted to the Government on account of the bond-aided line, it must

---

[7] And then, the decision quotes a passage from a message of President Cleveland, then very recently sent to Congress with the report of three commissioners appointed to investigate the affairs of railroad companies that had received government aid, declaring that the acts were passed upon the theory that the roads should be constructed "according to the common rules of business, fairness, and duty, and that their ability to pay their debts should not be impaired by unfair manipulations."

not imperil the government's opportunity to recoup, and concluded that all accounts, without regard to the route used, should be stated upon the basis of bond-aided mileage.

The company claimed that acquisition of Route 2 was necessary because it threatened the existence of the Central Pacific and that Route 3 was acquired for convenience because it had better grades than the original line. It argued that the Government had an interest in the new lines and should be willing to pay entire compensation for carriage over them. Against that contention the Second Comptroller said: "But the acquiring or building by a railroad of new lines connecting two points already connected by the road of the company is one of the ordinary elements of modern railroading, intended to enhance the usefulness of the original line, in the same way as does the *replacing of iron by steel rails,* or *wooden by stone buildings,* of *hand-brakes by automatic appliances.*[8] Is the Government to lose its right of withholding compensation for *carriage over a trestle,* the construction of which *in wood* it aided, simply because the railroad has seen fit *to replace the wooden structure by one of iron?*"

He denounced as untenable both the position of the Government and that of the company, and declared "that a medium course is not only practicable and equitable, but is justified under the Acts . . . by the changed and apparently unanticipated condition of affairs since the construction of the railroad was contemplated." He suggested that the company should recognize that the Government's security should not be impaired by a duplicating line, and that the Government should recognize such an improvement of route as materially lessens distance or difficulties of transportation between two points. Then reasoning in more definite terms, he said:

---

[8] Italics in quotations are added.

"If the original line . . ., 140 miles in length, were entirely aided, and the Government's supplies were taken over the new and unaided line, 90 miles in length, it would not be right on the one hand for the railroad to demand actual compensation for the 90 miles, or, on the other hand, for the Government to maintain that the account should be adjusted on a basis of 140 miles and that amount passed to the credit of the railroad on the Government's books. *The non-aided line was used to replace the aided line,* and credit for the 90 miles only should be given the railroad on the Government's books. The same reasoning applies when the original line was aided in part.

. "If of the original 140 miles . . . 103 were aided, and the accounts were so stated as to pay the railroad for 37 miles and carry 103 miles to the railroad's credit, the same ratio should be applied when transportation is over a new line between those points, and 103/140 of the total distance traversed should be considered as aided and should be carried to the railroad's credit on the Government's books, compensation for the balance of 37/140 being paid direct to the railroad."

Following these passages the Second Comptroller said: "If a railroad have a line between two points aided in whole or in part, and subsequently acquire a new line or lines, nonaided, between those same points, the accounts for Government transportation, when performed over the new line or lines, shall be stated in the same proportion of aided to nonaided miles, as though the transportation were over the original line." This is the statement found in par. 1160, 3 Dig. 2d Comp. 299, on which the Court of Claims grounded its judgment.

Applying the generalization so attempted he ruled: "On this basis the accounts of the railroad coming to this bureau will be finally settled. I am of the opinion that

substantial justice would thus be done—the railroad would not impair the security of the Government, and the Government would recognize the right of the railroad to make *improvements.*"

The crucial phrase of the generalization, "a new line or lines nonaided," would include mileage that is separate and distinct from an aided railroad maintained and kept in use between the same points. But the Second Comptroller, on the grounds that acquisition of new lines was the same as making additions and betterments to the original aided line and that Routes 2 and 3 were used to replace Route 1, treated the lines constituting the three routes as a single railroad bond-aided to the extent of 103/140 of its length.[9] It thus appears that the broad generalization does not express the principle of the decision or fit the situation described by it as mere betterment of the line built pursuant to the bond-aid contract.

The decision does not relate to the question in this case. Plaintiff does not contend that, if aided mileage of the Siskiyou stretch not used may be attributed to the Cascade stretch that was used to do the hauling in question, the corresponding percentage, 42.792 per cent, should not be applied. Plaintiff's point is that the findings preclude the assignment of any aided mileage to the nonaided Cascade stretch. The text of the Second Comptroller's decision shows that he did not decide or deal with any such issue.

2. Ruling of January 5, 1899 by Acting Comptroller Mitchell in a *Southern Pacific* case, V Dec. of Comp. of

---

[9] Under our decisions, the contract extended only to the aided railroad. *United States* v. *Kansas Pacific Ry. Co.,* 99 U. S. 455. *United States* v. *Central Pacific R. Co.,* 118 U. S. 235. As Route 2 had no aided mileage and Route 3 only 63 of its 151 miles, the Comptroller erred in treating the lines constituting the three routes as a single railroad.

Treas. 364. See Diagram 2. A government clerk traveled to Sacramento via Stockton. A part of the route used was bond-aided. He returned via Benicia on the shorter and usually traveled nonaided route. The question was whether payment should be made to the company for transportation over the nonaided route. This decision merely follows the uncalled for and inapplicable generalization attempted by Second Comptroller Butler in the *Central Pacific* case.

3. Ruling of November 19, 1900 by Assistant Comptroller Mitchell in an *Illinois Central* case, VII Dec. of Comp. of Treas. 224. See Diagram 3. The company operated a land-aided railroad between Cairo and Chicago. It had two routes for passenger travel between Cairo and St. Louis: the shorter via Carbondale and Pinckneyville, had some unaided mileage; the longer, via Du Quoin, was aided throughout. The Government having failed to designate either route and the shorter being the usually traveled one over which all through trains operated, the company carried the government passenger that way. The question was whether the land-grant deduction should be calculated on the percentage of land-aided mileage in the route used or on the greater percentage in the other route. Assistant Comptroller Mitchell did not follow the general statement of Second Comptroller Butler in the *Central Pacific* case but held that, as the Government did not choose between the routes, the deduction should be calculated on the mileage used.

In the list of administrative rulings, cited by the Government, this is the first one that involves construction of a land-grant Act. Land-aid differs essentially from bond-aid. Contracts in respect of the latter require government transportation over aided mileage at "fair and reasonable rates" and that the compensation earned be applied on the bond debt. No diminution of charges for government transportation is exacted. The railroad re-

ceives credit instead of cash for the charges calculated at full rates. But the land-grant Acts require service either free or at half rates forever. Questions as to compensation under them concern not merely form of payment of full charges but the amount of payment. Unreasonable indeed would it be to hold that carriers' acquiescence in government construction of bond-aid Acts is binding or entitled to weight in cases involving construction of the land-grant Acts.

DIAGRAM 3.

*Scale:* Appx. 1 inch = 26 miles.

Hatched Lines Show Land-aided Mileage.

4. Ruling of January 21, 1902 by Comptroller Tracewell in a *Great Northern* case, VIII Dec. of Comp. of Treas. 474. See Diagram 4. The Government shipped

property from St. Paul, Minnesota, to points west of Larimore, North Dakota. The company had three routes between the points just named. The percentage of aided mileage in the route via Crookston, "a," is larger than that in either route "b" or "c." The Government having failed to choose a route, the company hauled by the short-

DIAGRAM 4.

*Scale:* Appx. 1 inch = 74 miles.

Hatched Lines Show Land-aided Mileage.

est route, "c"; it was generally used for like service. The question was whether land-grant deduction should be calculated on the percentage of the shorter line actually used or the higher percentage of the longer one not used.

The decision, as well as the quoted generalization, of Second Comptroller Butler are in terms broad enough to

cover the question presented but Comptroller Tracewell, refusing to follow either, decided against the Government's contention. He said: "Where, with Government aid, two separate and independent lines of railroad have been constructed from a common point to entirely different points, but which subsequently by extension and independent connections are projected through a common point, and all these lines have subsequently passed to the control of a single company, and transportation is furnished between such common points for the Government by the most usually traveled of said routes, deduction for land grant should be made on the basis of such route, in the absence of a contract or a request for transportation by the other route."

If followed, this ruling would require land-grant deduction in the case at bar to be calculated on the land-grant mileage of the Cascade Route used. Compare Diagrams 1 and 4.

5. Ruling of February 28, 1911 by Comptroller Tracewell in a *St. Louis, Iron Mountain & Southern* (*Missouri Pacific*) case, XVII Dec. of Comp. of Treas. 633. See Diagram 5. The company had a land-aided railroad between Birds Point, Missouri (on the west bank of the Mississippi opposite Cairo, Illinois) and Texarkana, Arkansas, via Dexter, Missouri. Government shipments from Cairo to Dexter were generally transported across the river at Birds Point and thence by the land-aided line. On Government shipments between Cairo and Texarkana by that route, 99.247 per cent was land aided. Because of a change in the bed of the river, it was necessary to haul the shipments in question via Thebes and Illmo. The land-grant deduction applicable to that route was 81.234 per cent. The railroad insisted that, having been forced to give up the old route; it should not be required to make deduction for the nonaided mileage between Cairo and Dexter via Thebes. But the Comptroller re-

fused to accept that contention and ordered settlement on the basis of land-aided mileage in the route via Birds Point.

DIAGRAM 5.

*Scale:* Appx. 1 inch = 17 miles.

Hatched Lines Show Land-aided Mileage.

There is a fundamental difference between that case and the one before us. The carrier had abandoned the land-aided route for hauls between Cairo and Dexter. The Southern Pacific kept the Siskiyou Route in use.

6. Ruling of October 19, 1914 by Comptroller Downey in an *Atchison* case, XXI Dec. of Comp. of Treas. 238. See Diagram 6. The company has a line in Kansas between Lawrence and Chanute, land-aided to the extent of 91.3 miles and unaided as to 3.02 miles, part of the distance between Chanute and Humboldt. It has another line between Atchison and the Colorado boundary via Topeka and Emporia, all of which is land-aided. To connect these two aided lines there was built an unaided branch between Lawrence and Topeka and later another between Ottawa and Emporia. The Government shipped cement from Chanute to Holbrook, Arizona. Earlier the shipment would have moved through Humboldt, Ottawa, Lawrence, Topeka, Emporia, and thence to point of des-

422

DIAGRAM 6.

*Scale:* Appx. 1 inch = 58 miles.

Hatched Lines Show Land-aided Mileage.

tination. But, because of the construction of the branch between Ottawa and Emporia, the shipment in question was hauled over that line. By this route the haul be-

tween Chanute and Holbrook was 59.13 miles less than over the other route and aided mileage between those points was less by 91.42 miles. The Comptroller held that the land-grant deduction should be based on the land-aided mileage of the original route. He found that the land-grant Act (12 Stat. 772) required the aided railroads "to be and remain public highways for the use of the government" and that the branch lines made new through routes "to the abandonment, in part, of the aided through route." He said: "It has long been the holding of the accounting officers that the changing of a line of railroad and abandoning of any part of the original aided line does not deprive the Government of its original rights, and settlement for service over the new line is, therefore, required to be made as if the transportation were over the original line. (See 3 Dig. Dec. 2d Comp. 299; V Dec. of Comp. of Treas. 364)".

As the ground on which that ruling rests is abandonment of a part of the aided line, it gives no support to the judgment before us.

7. Ruling of October 1, 1917 by Comptroller Warwick in a *Missouri Pacific* case, XXIV Dec. of Comp. of Treas. 193. The published report does not disclose the physical situation. It is indicated by Diagram 7 prepared on the basis of information found in an unpublished opinion in the same case rendered May 8, 1917. The Government shipped stone from Batesville, Arkansas on an unaided line via Kansas City to Leavenworth Penitentiary, Kansas. An older route between the same points was via White River Branch Connection, Cairo Branch Connection, Carondolet Branch Connection, Pacific, and Kansas City. The ratio applicable in computing land-grant deduction for shipments hauled that way is 17.933 per cent. The Warden at Leavenworth paid the company for the service in question over the unaided line, without any land-grant deduction. However, the Comptroller held

424

the carrier subject to the same percentage of deduction as applied to the aided route. On the company's application he granted rehearing, upheld the principle on which he ordered the deduction, and declared it would be applied to future shipments. But, in view of particular facts and equities involved, he concluded that the accounts paid prior to the date of the decision could be allowed without land-grant deduction.

It requires no discussion to show that the direct route used should have been chosen for the transportation in question. The Comptroller cited no land-grant contract to support the rule that he made applicable to future shipments. Nor did he cite Second Comptroller Butler's ruling or any case—and so far as disclosed by diligent research, briefs of counsel and this Court's opinion just announced—there is none that tends to sustain so incongruous an attribution of aided mileage not used to an unaided route used.

8. Ruling of October 27, 1923 by Comptroller McCarl in a *Southern Pacific* case, 3 Comp. Gen. 267. See Diagram 8. This case involved a government shipment from Marshall (Spokane), Washington, to Roseburg, Oregon. It was routed over an unaided line of the Oregon-Washington Railroad & Navigation Company subject to an equalization agreement that charges would not exceed the amount payable had the service been by the land-grant line yielding the lowest net rate. The Northern Pacific line between Marshall and Portland via Pasco and Tacoma was land-aided. Later there was built between Pasco and Portland a line jointly owned by the Northern Pacific and the Great Northern; it is a part of the Spokane, Portland & Seattle Railway. Upon completion of that line, the Northern Pacific canceled its rates applicable between Marshall and Portland by its aided line through Tacoma and announced that the rates in its tariffs would

only apply via the new unaided line. The Comptroller held that, as to the government transportation in question, the aided stretch of the Northern Pacific had been abandoned, and that the Government was therefore entitled "to the transportation over the substituted line on the same basis as though transportation was furnished

Diagram 7.

Scale: Appx. 1 inch = 100 miles.

Hatched Lines Show Land-aided Mileage.

over the original land-grant line," and directed that land-grant deduction should be allowed.

That case differs from the one at bar in that the Northern Pacific, having no tariff applicable to the shipment.

426

via its aided line, had abandoned that line and for it substituted a new one.

9. The decisions in *Northern Pacific Ry. Co.* v. *United States* are next in chronological order. See Diagram 9,

DIAGRAM 8.

*Scale:* Appx. 1 inch = 64 miles.

Hatched Lines Show Land-aided Mileage.

SPOKANE

N.P.

PASCO

S. P. & S. R. R.

OREG.-WASH. R. R. (*Equalization Carrier*)

N.P.

OWNED JOINTLY BY GREAT NORTHERN AND NORTHERN PACIFIC

TACOMA

N.P.

PORTLAND

S.P.

TO ROSEBURG

on p. 428. On government request, the company transported two Marines by through passenger train from St. Paul to Seattle. The Northern Pacific land grant

aided a route from a point on Lake Superior to one on Puget Sound. Pursuant to the terms of the statute (Act of July 2, 1864, 13 Stat. 365) the aided railroad was built from the terminal established at Ashland in Wisconsin to the one established at Tacoma in Washington. Neither St. Paul nor Seattle is or ever was a terminal on that or any other land-grant line of the Northern Pacific. See *United States* v. *Northern Pacific Ry. Co.*, 177 U. S. 435, 441. St. Paul is more than 100 miles off the aided line; Seattle, more than 50 miles. In the route traveled by the train in question the only aided mileage between St. Paul and the original Northern Pacific land-grant line is a stretch of about 20 miles between Watab and Little Falls, which is a part of the land-aided railroad between Watab and Brainerd constructed by the Western Railroad Company under the Act of March 3, 1857, 11 Stat. 195.[10] There is no aided mileage between Seattle and Palmer Junction, where the original line connects with the route used.

The issue in the case was whether, in addition to an undisputed deduction of 3 per cent, there should be deducted from the full commercial fare, $63.16, a land-grant percentage of 46.001 per cent, as claimed by the company, leaving a balance of $33.09, or 47.285 per cent, as claimed by the Government, leaving a balance of $32.29. Thus the amount in issue as to each passenger was 80 cents.

The controversy arose from the fact that the Government attributed to the route used the stretches of aided mileage between Little Falls and Staples via Brainerd and between Palmer Junction and Auburn via Meeker, amounting in all to 94.24 miles.

The Government's theory was that the new unaided lines were "merely alternate or lieu routes—routes estab-

---

[10] Between Minneapolis and St. Paul the Northern Pacific uses, under an operating contract, 8.23 miles of land-aided road belonging to another company. That stretch was not involved in the litigation.

428

DIAGRAM 5.

Hatched Lines Show Land-aided Mileage.

Scale of Miles

0 40 80

APPROXIMATELY 1700 MILES OF LAND-AIDED ROAD OMITTED.

SEATTLE

TACOMA

AUBURN

MEEKER

PALMER JC.

STAPLES

BRAINERD

LITTLE FALLS

WATAB

MINNEAPOLIS

ST. PAUL

ASHLAND

Scale of Miles

0 8 16

lished by the railroad to shorten or straighten its line" and that therefore the calculation of land-grant deduction should take into account aided mileage not used to render the service in question. The district court refused so to interpret the facts and held the deduction should be calculated on mileage actually used. 22 F. 2d 858, 859. But the circuit court of appeals, one judge dissenting, found that the unused aided mileage had been abandoned. 30 F. 2d 655. And upon that interpretation of the stipulated facts, it said (p. 659): "It thus appears that, except by this latter route, [i. e. via unaided stretches between Little Falls and Staples, and between Palmer Junction and Auburn] through carriage by the Northern Pacific [from St. Paul] to the entire Pacific coast is abandoned." The facts clearly distinguish that case from the one now under consideration. It is here immaterial whether the judgment rests on a correct or erroneous interpretation of the stipulation on which the case was submitted. It is enough to say that the aided stretches were excluded by the company because not used and were included by the Government on the ground that having been abandoned, they should be attributed to the route used.

10. Ruling of June 23, 1931 by Comptroller General McCarl in a *Missouri Pacific* case, 10 Comp. Gen. 552. See Diagram 10. The company constructed an unaided cut-off between Jedburg Junction and Eureka Junction, intermediate points on its land-aided line between St. Louis and Pacific. The distance between them via the cut-off is 2.99 miles. Over the old land-aided line via Glencoe, it is 4.93 miles. That track was still in use for some local trains. At another place on its line, within the city of St. Louis, the company substituted 0.68 of a mile of nonaided line for a longer one which is aided. The Comptroller General held that the aided mileage not used should be attributed to the cut-off mileage used. He said: "It would seem to be too clear for serious argument that

of the distances shown after the cut-off . . . between Eureka and Jedburg and the 0.68 miles from union station connection to the union station, or a total of 3.67 miles is not over the land-grant line, but it is equally clear that the new mileage of 3.67 miles was substituted for mileage over the original line for which grants of public lands were made."

It requires imagination to discover in that case anything in principle or in fact that will support the conclusion reached by the Court of Claims in the case at bar.

11. Ruling of January 16, 1936 by Comptroller General McCarl, 15 Comp. Gen. 614. It has no bearing upon the case at bar. The question was whether, in computing percentage of land grant deduction, the line of the Spokane, Portland & Seattle Railway between Pasco and Portland (see Diagram 8), owned jointly by the Northern Pacific and the Great Northern, is to be regarded as a Northern Pacific line. The Comptroller General answered in the affirmative.

### IV.

There is apparent attempt to draw from the Act of 1928 some support for the construction on which this Court affirms the judgment below. But, so far as concerns the question in this case, that Act does not indicate any congressional interpretation of the land-grant Act of 1866. The sole purpose of that measure was to substitute 50 per cent deduction in place of free transportation; it was passed in order to relieve the Southern Pacific of a burden to which other aided railroads were not subject. When it was enacted, May 23, 1928, only eight of the rulings above referred to had been made; two related to bond-aid contracts and are not in point; two were in favor of the railroads and do not support the judgment in this case. And, as above shown, none gives any support to

the expansion of the terms of the contract that is here made. The 1928 Act was passed while the decision of the district court in the *Northern Pacific* case remained un-

DIAGRAM 10.

Hatched Lines Show Land-aided Mileage.

reversed. 22 F. 2d 858 (1927). That case was not decided in the circuit court of appeals until 1929, 30 F. 2d 655. If the Act could be deemed to be a construction of

the land-grant—as plainly it may not—it would have to be read as approving the decision of the district court, for that was the only judicial decision in that field.

## V.

The land-grant line has been kept in use. The contract is that, where government transportation is wholly over that line, deduction of 50 per cent shall be made and that, where it is partly over that line, there shall be deducted the percentage that aided mileage used is of total haul. But this Court holds that, even if the Government elects to have its freight move over a separate and distinct unaided railroad, the plaintiff is bound to apply the percentages applicable to charges for transportation over the aided line. Thus the decision implies a formula or rule to the effect that a land-grant deduction once found applicable to charges for transportation over a route made up of aided and unaided mileage between two points is to be applied to all subsequent government shipments between those points, even if the route actually used includes no aided mileage. There is nothing in this contract or in any of the railroad land-grant Acts, either as written or as hitherto construed, to warrant that construction.

I am of opinion that the judgment should be reversed.

Mr. Justice McReynolds and Mr. Justice Roberts join in this opinion.