**SANTA FE PACIFIC RAILROAD COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–803L.

United States Court of Federal Claims.

Jan. 11, 2001.

Jerome C. Muys, Muys & Associates, P.C., Washington, D.C., attorney of record for plaintiff.

Kristine S. Tardiff, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Lois J. Schiffer, for defendant.

OPINION

ALLEGRA, Judge.

This case is the modern legacy of a series of events that began in 1866, when the United States, flush with a desire for expansion, made large land grants to the railroads to promote rail construction in its developing Southwest territories. Some of these lands eventually wended their way to the Santa Fe Pacific Railroad Company (plaintiff or "Santa Fe"). In this case, Santa Fe claims that 862 acres of property in Arizona granted by the United States in 1866 were repossessed under the Western Lands Dispute Act of July 2, 1993, Pub.L. No. 103–48, 107 Stat. 234, resulting in a compensable taking under the Fifth Amendment. In a motion for summary judgment, defendant claims that Santa Fe long ago relinquished its rights to these properties in exchange for other government-conferred benefits, among them, increased rail tariffs for the carriage of government personnel and freight. Santa Fe has responded to this motion by filing a cross-motion for summary judgment, denying that it previously relinquished its rights to the

parcels in question. After careful consideration of the briefs filed, the oral argument, and for the reasons discussed below, the court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiff's cross-motion for summary judgment.

## I. Facts

The facts in this case are largely stipulated. In order to "secure the safe and speedy transportation of mails, troops, munitions of war, and public stores,"[1] the Congress, following the Civil War, pursued a land grant program to aid the construction of railroads in the Southwestern United States. Under this program, enormous areas of public lands were granted to the railroads in exchange for their commitments to build railroads and ship government personnel and freight at a significant discount. In one such grant, on July 27, 1866, Congress enacted legislation (the 1866 Act) incorporating the Atlantic and Pacific Railroad Company ("A & P") and authorizing it to construct a railroad from Missouri to the Pacific Ocean. *See* 14 Stat. 292. To aid construction, sections 2 and 3 of the 1866 Act granted the railroad a right of way 200 feet wide over the route and authorized the company to earn a land grant of alternate, odd-numbered sections for twenty miles on either side of the right of way in the states and forty miles in the territories.[2] *See id.* at 294–95. A & P went bankrupt in 1894, and the Atchison Topeka and Santa Fe Railroad acquired that portion of A & P's rail line that extended from Isleta, New Mexico to Needles, California, succeeding also to A & P's adjacent land grants. The Atchison created a new subsidiary, the Santa Fe Pacific Railroad Company, to manage the acquisition. Under the 1866 grant, Santa Fe eventually acquired title to over 13 million acres of land, including the seventeen parcels here at issue.

In the latter part of the nineteenth century, the country turned its eye from settlement to conservation, and Congress passed legislation authorizing the President to create permanent forest reservations. Pursuant to this authority, in 1893, President Harrison created the Grand Canyon Forest Reserve (the Grand Canyon Reserve) in Arizona, and, in 1898, President McKinley established the San Francisco Mountains Forest Reserve (the San Francisco Reserve) in Arizona. Difficulties in consolidating these reserves arose due to the presence, within their boundaries, of privately owned lands, including land held by the railroads. In part to resolve this problem, Congress enacted the Forest Lieu Selection Act (the 1897 Act), Act of June 4, 1897, 30 Stat. 11, whereby an owner of a tract of land or unperfected bona fide claim to lands within a designated reserve could relinquish the claim or reconvey the land to the United States and select, in lieu thereof, "vacant land open to settlement." *Id.* at 36. Concerned that speculators were swapping barren waste lands in the reserves for valuable timbered or mineralized properties, the Congress, in 1900, modified its original offer by limiting the selections of land made in lieu of tracts relinquished to the government under the 1897 Act to "vacant surveyed nonmineral public lands which are subject to homestead entry not exceeding in area the tract covered by such claim or patent." *See* Act of June 6, 1900, 31 Stat. 614.

The Grand Canyon Reserve encompassed land claimed by or already patented to Santa Fe under its railroad land grant, thus making Santa Fe eligible to receive lieu lands under the 1897 Act. In July, 1902, pursuant to an exchange of correspondence, Santa Fe and the Secretary of the Interior (Secretary) entered into a contract under which Santa Fe agreed to surrender the title to its lands within the Grand Canyon Reserve in exchange for selection rights under the 1897 Act. Some of this land was untimbered and, under the contract, the selection rights Santa Fe received in exchange for 260,000 of the

---

1. Act of July 27, 1866, ch. 278, § 3, 14 Stat. 292, 294.

2. Since the United States had previously disposed of some of this same so-called "place limits" acreage to homesteaders, it established additional strips of ten miles on either side of the place limits in which the railroad could select so called "indemnity" lands from the odd-numbered sections. The 1866 Act, 14 Stat. 295. *See Chapman v. Santa Fe Pac. R.R. Co.,* 198 F.2d 498, 499 (D.C.Cir.1951), *cert. denied,* 343 U.S. 964, 72 S.Ct. 1058, 96 L.Ed. 1361 (1952).

375,000 acres were restricted to nonmineral, non-timbered, vacant public lands south of the Tehachapi Mountain Range in California; the remaining selection rights were unrestricted. Two of the seventeen parcels at issue in this case were subject to this contract. Deeds of conveyance for these parcels were executed by Santa Fe and recorded in county records in 1902 and 1917, respectively.

The San Francisco Reserve originally encompassed only the government-owned, even-numbered sections, excluding the odd-numbered sections owned by Santa Fe and other private individuals. But omitting these odd-numbered lots left the forest reserve an odd "checkerboard," creating paralyzing administrative problems for government and private owners alike. Seeking to remedy this, in 1900, Santa Fe and other private property owners within the reserve petitioned the United States to acquire their property. Ultimately, on April 2, 1902, Santa Fe and several other property owners, via an exchange of correspondence, entered into a contract with the Secretary, under which the parties agreed to relinquish their lands within an expanded San Francisco Reserve in exchange for the right to select lieu lands under the 1897 Act. Ten days later, this deal was consummated when a presidential proclamation expanded the San Francisco Reserve to include the odd-numbered sections. *See* Proclamation No. 15, April 12, 1902, 32 Stat.1991, 1991–93. The selection rights received by Santa Fe in exchange for 146,680 acres of the 507,358 acres subject to this 1902 contract were restricted to nonmineral, non-timbered, vacant public lands south of the Tehachapi Mountain Range; the remaining

selection rights were unrestricted. Among the acreage covered by this 1902 contract and the expanded reserve were the remaining fifteen parcels of land at issue in this litigation. The deeds of conveyance for each of these parcels were executed by Santa Fe and recorded in county records between 1903 and 1910.

Thus, in two 1902 contracts—one relating to the Grand Canyon Reserve and the other to the San Francisco Reserve—Santa Fe relinquished approximately 927,000 acres of land in return for lieu rights or scrip[3] entitling it to select and receive patents to the same number of acres of public land. 406,000 acres of this scrip were "restricted," and could be used only to acquire public lands south of the Tehachapi Mountains; the remaining 521,000 acres of scrip were "unrestricted" and could be used to acquire any unreserved public lands.[4]

In 1905, Congress repealed the 1897 Act, but preserved contracts entered into, and applications for lieu lands that had been submitted, prior to the repeal, leaving Santa Fe's selection rights unimpaired. *See* Act of March 3, 1905, 33 Stat. 1264 (the 1905 Act). The 1905 Act, however, left some private owners in limbo, with no way to exercise their swapping rights. *See Strickland v. United States*, 199 F.3d 1310, 1311–12 (Fed. Cir.1999). Congress eventually responded to these owners' plight by passing the Act of September 22, 1922, Pub.L. No. 67–339, 42 Stat. 1017 (the 1922 Act), which authorized the Secretary to accept lands from persons identified on a list made by the Secretary in 1906, in exchange either for patents for lieu property selected by the grantor or for timber rights on other national forest lands.

---

**3.** According to one of defendant's exhibits, scrip is "a document or a right authorized by an Act of Congress, which entitles a person to acquire a designated number of public land acres in the United States." *See* Bureau of Land Management, U.S. Dep't of the Interior, Information About Scrip (1964). *See also* 43 C.F.R. § 2221.8 (1965) (describing scrip).

**4.** In the years that followed, Santa Fe assigned most of its selection rights to so-called "scrip dealers" and third parties. Since the selection rights were technically nonassignable, *see Udall v. Battle Mountain Co.*, 385 F.2d 90 (9th Cir. 1967), *cert. denied*, 390 U.S. 957, 88 S.Ct. 1041,

19 L.Ed.2d 1151 (1968), Santa Fe adopted a process that utilized two powers of attorney to accomplish these transactions—the first appointed an attorney-in-fact to make a selection of property in the name of the railroad, while the second authorized him to convey the selected lands to whomever he chose. Santa Fe used this mechanism to dispose of virtually all the selection rights it received under its 1902 contracts. Surviving records, however, do not allow this court to determine precisely which of the parcels at issue were actually transferred via this procedure, with many of the powers of attorney almost certainly having lapsed before being exercised.

However, in order to obtain compensation, landowners had to file applications for lieu lands or timber within five years of this statute's enactment; many owners, for various reasons, failed to pursue their claims. This led Congress to pass the Act of April 28, 1930, Pub.L. No. 71–174, 46 Stat. 257 (the 1930 Act), under which the United States agreed to reconvey lands previously relinquished to the United States under the 1897 Act back to the original owners who had not elected one of the options under the 1922 Act. Santa Fe did not press claims under, or otherwise invoke, either the 1922 or 1930 Acts.

While the 1897, 1905, 1922 and 1930 Acts covered all private property owners entitled to lieu lands, including the land grant railroads, the Transportation Act passed by Congress in 1940 (the 1940 Act), Pub.L. No. 76–785, 54 Stat. 898 dealt solely with such railroads. Section 321(a) of the 1940 Act freed the land grant railroads, including Santa Fe, of the obligation to carry government freight and personnel at a reduced rate, instead allowing them to charge the "full applicable commercial rates" (except for official military transport). To qualify for these new rates, however, the railroads had to surrender certain rights to grant lands that were not patented. *Id.* at § 321(b). Where a railroad had previously conveyed unpatented lands to third parties, the 1940 Act provided that the railroad could submit a list of such parties to the Secretary and that their rights would be preserved and protected if they were found to have purchased the lands from the railroad in good faith and for value.[5] Pursuant to the 1940 Act, on December 18, 1940, Santa Fe filed a release of:

> any and all claims of whatever description to lands, interests therein, compensation or reimbursement therefor on account of lands or interests granted, claimed to have been granted, or claimed should have been granted by any act of the Congress to

Santa Fe Pacific Railroad Company or to any predecessor in interest in aid of the construction of any portion of its railroad.

The release indicated that it did not embrace lands sold by the company to innocent purchasers for value prior to September 18, 1940; lands represented in selections made by Santa Fe and approved by the Secretary prior to that date; or lands that had been patented or certified to the company in aid of the construction of its railroad. Santa Fe's release was approved by the Secretary and became effective on March 1, 1941. *See* 6 Fed.Reg. 2634, 2635 (May 29, 1941).

Many other railroads failed to exercise their rights under the 1930 Act until the 1950s, when some of them obtained reconveyance of certain highly valuable lands then within areas that had been established as national forests or national parks. *See* H.R.Rep. No. 102–89, at 5 (1991). This led to "what the public press, conservation interests and others regarded as being virtually a 'give-away' of public resources approaching a scandal." Sen. Rep. No. 1639 (1960), *reprinted in* 1960 U.S.C.C.A.N. 2743, 2744. In response, on August 5, 1955, Congress enacted legislation providing for the recordation of certain outstanding private claims for federal lands and specifying the consequences of failing to record such claims. Act of August 5, 1955, 69 Stat. 534 (the 1955 Act). One category of claims specifically identified by this 1955 Act was "a forest lieu selection right, assertable under the" 1905 Act. *Id.* While the selection rights Santa Fe had received under its 1902 contracts with the Secretary were "forest lieu selection rights," Santa Fe did not record any such rights under the 1955 Act. In 1960, Congress, yet again, revisited this issue, passing what came to be known as the Sisk Act, Act of July 6, 1960, Pub.L. No. 86–596, 74 Stat. 334, giving those who had conveyed their property under the 1897 Act, but had not yet received lieu lands or other compensation, another "last chance"

---

5. During consideration of legislation by Congress during the period 1938–1940 to release the railroads of that obligation, Congress was informed that Santa Fe and a number of other railroads had claims pending before the Secretary for millions of acres of unsatisfied land grants and that they had sold the rights to lands covered by some

of those claims to third parties. *Hearings on S.1915, S.1990 and S. 2294 before a Subcomm. of the Senate Comm. on Interstate Commerce*, 76th Cong. 5, 57–59 (1939) (statement of L.F. Kneipp, Assistant Chief, Forest Service, Dep't of Agriculture).

to file a claim for compensation within one year after enactment. However, no claims were ever filed under the Sisk Act.

A subsequent "last chance" statute was passed in 1993, the Western Lands Dispute Act (the 1993 Act), Act of July 2, 1993, Pub.L. No. 103–48, 107 Stat. 234, which provided that all lands for which compensation had not been sought should be quitclaimed back to the owners unless they were identified by the Secretaries of the Interior and Agriculture as "nationally significant lands." The 1993 Act directed the Secretaries to prepare a "final list" of such lands to be retained for public needs. These land would not be returned to the owners; rather, title would vest in the United States [6] and the owners could bring suit in this court for compensation within one year after publication of the final list. The list was published on December 26, 1995, and included the property at issue in this case. *See* 60 Fed. Reg. 66, 780 (1995).

On December 23, 1996, plaintiff filed a claim for compensation for defendant's alleged taking of 1,176 acres of land in Arizona owned by plaintiff. Under the 1993 Act, these properties were listed in the Federal Register by the Forest Service, designating them as "nationally significant." Plaintiff alleges that, as a result of this listing, all of plaintiff's right, title, and interest in the subject properties vested in the United States. Plaintiff states that it has never received any federal lands in exchange for the subject properties, as provided for in the 1897 Act, or any other compensation for the lands, nor has the United States reconveyed to plaintiff or formally disclaimed any legal interest it may have in the subject properties. It, therefore, claims compensation under the

Fifth Amendment for the value of the taken properties.

On May 29, 1998, the parties stipulated to the dismissal, with prejudice, of the plaintiff's claims relating to four of the seventeen parcels originally covered by plaintiff's complaint, reducing the total acreage at issue to 862 acres. *See* 60 Fed.Reg. 66,782 (1995). On June 12, 1998, defendant filed a motion for summary judgment and, on July 22, 1998, plaintiff filed a cross-motion. The case was eventually assigned to the undersigned judge,[7] following which the parties filed supplemental briefs addressing the effect of the Federal Circuit's decision in *Strickland v. United States*, 199 F.3d 1310 (Fed.Cir.1999). Oral argument was heard in the case on October 31, 2000.

## II. Discussion

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As noted, the facts material to the motions are essentially undisputed. Based on those facts, the court concludes, as a matter of law, that defendant is entitled to summary judgment.

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In order to prevail on its claim under this amendment, Santa Fe must establish that it had a property interest in each of the subject properties as of December 26, 1995, the date on which all outstanding right, title, or interest in or to properties identified under the 1993 Act as "nationally significant" vested in the United

---

**6.** The 1993 Act stated: "Subject to valid existing rights arising from factors other than those described in subsection (b)(1), any right, title, and interest in and to lands identified and not previously vested in the United States is hereby vested and confirmed in the United States." 1993 Act, § 2(c)(2), 107 Stat. 234.

**7.** Prior to this transfer, on February 9, 1999, Judge Hodges dismissed the plaintiff's complaint, holding, under *Strickland v. United States*, 42 Fed.Cl. 41 (1998), *rev'd*, 199 F.3d 1310 (Fed.Cir.

1999), that title to relinquished lands pursuant to the Act of 1897 vested in the United States by reason of the Sisk Act and, thus, the statute of limitations barred suit in this court. The court held that *Santa Fe* involved the same issue as raised in *Strickland* and, therefore, was dispositive of the issues. Plaintiff filed a Motion for Reconsideration on February 16, 1999, to which defendant responded on April 1, 1999. Then, on April 14, 1999, Judge Hodges vacated his February 9th order.

States. *See Karuk Tribe v. Ammon,* 209 F.3d 1366, 1374 (Fed.Cir.2000) (stating that under takings analysis, "[f]irst, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action"); *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580 (Fed.Cir. 1993), *cert. denied,* 516 U.S. 870, 116 S.Ct. 191, 133 L.Ed.2d 127 (1995) (citing *United States ex rel. Tennessee Valley Auth. v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943)); *Gonzales v. United States,* 48 Fed.Cl. 176 (2000). In this connection, the Supreme Court has held that the Constitution does not create property interests. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). Rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Id.* (citing *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

Defendant raises several arguments directed at establishing that Santa Fe long ago divested itself of the property interests in question. Thus, for example, defendant contends that Santa Fe relinquished title and its interest in the subject properties upon execution of the 1902 contracts and subsequent delivery of the deeds to those properties to the United States. Assuming, *arguendo,* that Santa Fe's rights survived these transactions, defendant also contends that, under the 1940 Act, Santa Fe released its rights to select lieu lands under the 1897 Act in exchange for receiving higher tariffs from the government for the transportation of personnel and freight. The court believes that this second prong of defendant's arguments is dispositive, making consideration of defendant's other arguments unnecessary.[8]

The 1866 Act, under which Santa Fe received its railroad land grant, required Santa Fe to carry government personnel and freight at a reduced charge. During and following the Great Depression, railroad earnings declined considerably and a movement began to relieve the railroads of their land-grant discount rate obligations.[9] This movement ultimately came to fruition in the 1940 Act, section 321(a) of which generally freed the railroads from hauling government freight and personnel at the land grant discount rates—but with an important proviso. That proviso was contained in section 321(b) of the 1940 Act, which stated:

> If any carrier by railroad furnishing such transportation, or any predecessor in interest, shall have received a grant of lands from the United States to aid in the construction of any part of the railroad operated by it, the provisions of law with respect to compensation for such transportation shall continue to apply to such transportation as though subsection (a) of this section had not been enacted until such carrier shall file with the Secretary of the Interior, in the form and manner prescribed by him, a release of any claim it may have against the United States to lands, interests in lands, compensation, or reimbursement on account of lands or interests in lands which have been granted, claimed to have been granted, or which it is claimed should have been granted to such carrier or any such predecessor in interest under any grant to such carrier or such predecessor in interest as aforesaid.

54 Stat. 898, 954–55. On December 18, 1940, Santa Fe filed a release under this Act of "any and all claims of whatever description to lands, interests therein, compensation or reimbursement therefor on account of lands or interests granted, claimed to have been

---

**8.** Other arguments raised by defendant assert, *inter alia,* that (i) because Santa Fe failed to register its claims under the 1955 Act, the subject properties vested in the United States under the Sisk Act, making the current suit untimely; (ii) plaintiff's claim is barred by defendant's acquisition of the subject properties by adverse possession; and (iii) plaintiff's claim is barred by the doctrine of laches.

**9.** *See Hearings Before the House Comm. on Interstate and Foreign Commerce,* 76th Cong. 259 (report of Comm. appointed September 20, 1938, by the President of the United States to submit recommendations upon the general transportation situation) (1939); H.R. Doc. No. 584, at 32 (1938).

granted, or claimed should have been granted by any act of the Congress to Santa Fe Pacific Railroad Company or to any predecessor in interest in aid of the construction of any portion of its railroad." By virtue of this release, under the 1940 Act, Santa Fe was thereby freed of its obligation to carry non-military government freight at reduced rates.

Having pocketed increased tariffs from the government over the last sixty years, Santa Fe now argues that the 1940 Act and its release thereunder do not involve its claims to the property in question. Defendant, for its part, essentially argues that Santa Fe must abide by the trade it made under the 1940 Act's waiver provision. The starting point in analyzing these contentions is, of course, the language of the 1940 Act, for "[i]f the intent of Congress is clear, that is the end of the matter." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[10] In this regard, the court finds that plaintiff's assertions are belied by the exceedingly broad language of the 1940 Act, not to mention the equally broad language of the release that Santa Fe executed. Thus, section 321(b) of the 1940 Act not only conditions the availability of higher tariffs on the release of claims to lands "which have been granted, claimed to have been granted, or which it is claimed to have been granted," but also on the railroads' release of claims to "interests in land, compensation or a reimbursement on account of lands" that have been provided. In the court's view, it seems inescapable that the latter provision clearly encompasses not only the original land grants under the 1866 Act, but also any rights Santa Fe obtained under the 1897 Act, as well as any rights obtained or retained under the 1902 contracts, the 1905 Act, and the various and sundry land grant compensation schemes subsequently enacted by Congress.

Plaintiff attempts to limit the impact of its release by claiming that the language of the 1940 Act did not apply to forest lieu selection claims under the 1897 Act and its two 1902 contracts, but instead applied only to rights deriving directly from the original 1866 land grant. It asserts that the interests it obtained in 1897 and 1902 did not involve, in the words of section 321(b), "a grant of lands from the United States to aid in the construction of any part of the railroad operated by it." This assertion, however, is based on a misreading of the statute. Taken in context, the quoted language is precatory and merely identifies those railroads eligible to receive increased freight rates. In order to actually qualify for those higher rates, the eligible railroads were required to comply with an important additional condition—they had to release not only their claims to original lands granted that were not patented, but also any claims to "compensation, or reimbursement on account of lands or interests in lands which have been granted, claimed to have been granted, or which it is claimed should have been granted to such carrier." While plaintiff argues that a broad reading of this claim language could lead to ridiculous results,[11] the court need not strain the outer limits of this quoted language in order readily to conclude that it squarely covers whatever compensation rights Santa Fe obtained via the 1897 Act and the two 1902 contracts. A contrary ruling—one limiting the waiver under the 1940 Act only to actual land grant rights—would essentially render the words "compensation" and "reimbursement" in the act surplusage, a construction that would clearly violate accepted canons of statutory construction. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (noting a "reluctance to treat statutory terms as surplusage"); *Mountain States Tel. & Tel. Co. v. Pueblo of Santa*

10. *See also Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993); *Strickland v. United States,* 199 F.3d at 1313–14.

11. For example, plaintiff posits that the 1940 Act and its release could not be as broad as the

language would suggest because such a reading would result in the waiver of trespass or negligence claims relating to actions physically occurring on the parcels originally received from the government. The instant case, of course, does not involve such tort claims.

*Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985).

Plaintiff's construction of section 321(b) necessarily presumes that Congress forfeited the valuable land grant rates and fares it received under the 1866 Act, while allowing the railroads to retain significant benefits they derived from that same act, *to wit,* not only the original grant lands that had been patented, but also the right to receive potentially millions of acres of lieu land via claims that were unsettled. While the legislative history of the 1940 Act is sparse,[12] it does not suggest that Congress struck such a lopsided deal.

To the contrary, the legislative history indicates that section 321(b) was enacted at the urging of various government officials who believed it was inequitable to allow the railroads to charge higher fees unless they agreed to cede their extensive land claims. For example, in a letter to the Chairman of the Senate Committee on Interstate Commerce, Attorney General Frank Murphy described pending litigation with the Northern Pacific Railway involving claims by that railroad under its land grant. Asserting that the Northern Pacific had already received lands in a value that far exceeded its original rail construction costs, the Attorney General, commenting on the proposed version of the 1940 Act, stated:

> Under these circumstances it would seem hardly appropriate that the United States should, without consideration, relieve the company of its continuing obligation, at least until the company has released the United States from any claim it may have under the land-grant acts.

There is a probability that other land-grant railroads have possible claims against the United States arising out of land grants.... However, it would seem advisable that, in the event any such relinquishment is to be provided for by legislation, all land-grant railroads should be required to release their claims under these contracts against the United States.

*Hearings on S.1915, S.1990, and S. 2294 before a Subcomm. of the Senate Comm. on Interstate Commerce* [hereinafter Hearings], 76th Cong. 66 (1939) (statement of Frank Murphy, Attorney General). At the hearings at which this letter was received by the Committee, a Justice Department official embellished the Attorney General's views, asserting:

> It is merely a position which we believe to be eminently just and fair that one party to an executory contract asking another to relinquish in its favor obligations should likewise be willing to relinquish in favor of the United States obligations which it claims exist on the part of the United States and in their favor.

*Id.* at 65 (statement of E.E. Danly, Special Assistant to the Attorney General). Nowhere in the legislative record is there the slightest hint that Congress seriously considered allowing railroads to reserve their claims to lieu lands and still receive the benefit of the increased freight rates.[13] Accordingly, the legislative history of the 1940 Act supplies no persuasive reasons for this court to depart from that statute's plain language.

Relying, in part, on this legislative history, the Supreme Court, in *Krug v. Santa Fe Pac. R.R. Co.,* 329 U.S. 591, 67 S.Ct. 540, 91 L.Ed.

---

**12.** The House and Conference Reports accompanying the enactment of the 1940 Act simply restated the terms of Section 321(b), without comment. *See* H.R. Rep. 1217, at 28 (1939); H.R. Conf. Rep. 2832, at 93 (1940).

**13.** In testimony before Congress, officials representing two other agencies favored requiring the railroads to relinquish not only their claims to lieu lands, but also all property they had received under the original grants that were not being used directly for rail transportation. Typical of these comments was a letter sent by Harold L. Ickes, Secretary of the Interior, to the Chairman

of the Senate's Committee on Interstate Commerce, in which the author stated:

> I suggest that, if it should be decided to provide Federal aid to railroads by abolition of the preferential rate, the railroads should be required to forego to the Government their rights to further land in satisfaction of their land grants and to relinquish to the United States the title to all the unsold lands which have previously been granted to them.

Hearings, *supra,* at 164–65. *See also* Hearings, *supra,* at 5 (statement of Joel David Wolfson, General Land Office); 60 (statement of L.F. Kneipp, U.S. Forest Service).

527 (1947), rejected a construction of section 321(b) of the 1940 Act virtually identical to that offered by plaintiff here. In *Krug*, Santa Fe sought to exercise selection rights received under the Act of June 22, 1874, 18 Stat. 194, and the Act of April 28, 1904, 33 Stat. 556, but the Department of the Interior found that all claims arising under these acts were relinquished by the railroad's release under the 1940 Act. *See Santa Fe Pac. R.R. Co.*, 58 Interior Dec. 596 (1944); *Santa Fe Pac. R.R. Co.*, 58 Interior Dec. 601 (1944). On appeal, the district court (in *Santa Fe Pac. R.R. Co. v. Ickes*, 57 F.Supp. 984, 987 (D.D.C.1944)) held that the statute and release barred the claims and read the 1940 Act as defining a congressional purpose "to wipe the slate clean of such claims by any railroad which enjoyed the benefits of the rate concessions made by the Transportation Act." *Id.* Although the D.C. Circuit reversed this ruling, the Supreme Court, in turn, agreed with the district court and rejected Santa Fe's claim that its lieu land claims were not claims "on account of" or "under any grant" of lands and, therefore, outside the scope of its release. *Krug*, 329 U.S. at 597–98, 67 S.Ct. 540.

In so ruling, the Supreme Court first focused on the 1940 Act's broad language, reasoning:

> The railroad urges that these claims are not covered by the Act or by the release. They, allegedly, are not claims 'on account of' or 'under any grant' of lands, but rest on contractual exchanges of lands made under the Acts of 1874 and 1904.
>
> \* \* \* \* \* \*
>
> The respondent argues the case here as though the 1940 Act only applied to claims for 'lands under any grant.' The language is not so narrow. It also required rail-

roads to surrender claims for 'compensation, or reimbursement on account of lands or interests in lands which have been granted, claimed to have been granted, or which it is claimed should have been granted ... under any grant'. This language in itself indicates a purpose of its draftsmen to utilize every term which could possibly be conceived to give the required release a scope so broad that it would put an end to future controversies, administrative difficulties, and claims growing out of land grants. Beyond a doubt the words 'compensation' and 'reimbursement' as ordinarily understood would describe a payment to railroads in money or in kind for the surrender of lands previously acquired by them 'under a grant.' If they do not have this meaning, their use in the Act would have been hardly more than surplusage. And when viewed in the context of the historical controversies and claims under the land grants, the conclusion that the 1940 Act covers claims such as respondent's seems inescapable.

*Id.* at 596–598, 67 S.Ct. 540. Reflecting on the legislative history of the 1940 Act discussed above, the Supreme Court observed that the Congress was aware of the "complexity and ramifications of the numerous questions involving land grant controversies" and noted that "Government officials ... [had urged] Congress to include in the predecessors of the 1940 Act a requirement that the railroad surrender all claims arising out of land grants as a prerequisite to any Government rate concessions." *Id.* at 598, 67 S.Ct. 540. With this legislative and historical context in mind, the Court thus concluded that "[w]e think Congress wrote finis to all these claims for all railroads which accepted the Act by executing releases." *Id.*[14]

**14.** Congress tended to deal with land grants to railroads on a case-by-case basis, leading to dozens of pieces of legislation dealing with particular rail projects. While these enactments had common features, they were passed over roughly seventy years and are hardly the picture of linguistic uniformity. Some of them had specific grant language. *See, e.g.,* Act of July 1, 1862, 12 Stat. 489 (Union Pac. R.R.). Others primarily provided rights of way, essentially granting easements through public lands, with some limited land grants for rail associated facilities. *See* Act

of March 3, 1849, 9 Stat. 771 (granting a right of way through the lands of the United States to the Atlantic and Gulf R.R. Co.); Act of March 3, 1849, 9 Stat. 772 (granting a right of way to the Mobile and Ohio R.R. Co.); Act of March 3, 1837, 5 Stat. 197 (granting a right of way through portions of the public lands remaining unsold to the New Orleans and Carrolton R.R. Co.); Act of July 2, 1836, 5 Stat. 65 (granting to the New Orleans and Nashville R.R. Co. the right of way through the public lands of the United States). Still others were similar to the 1874,

In the case *sub judice*, as in *Krug*, the base lands were granted to the railroad in aid of construction by the 1866 Act and were exchanged, under subsequent enactments and implementing agreements thereunder, for the right to select lieu lands of comparable size from the public domain. The two-pronged rationale in *Krug*—focusing first on the 1940 Act's language and then on its legislative history—thus seemingly fits like a glove here. Plaintiff, however, argues that *Krug* is inapposite because that case involved claims growing out of land grants under the Acts of June 22, 1874 and April 28, 1904, which unlike the 1897 and 1905 Acts, were essentially supplemental railroad grant lands. However, the court does not believe that 1874 and 1904 Acts were fundamentally different from the acts here under consideration, as all these statutes allowed the rail-

road companies the right to select equal quantities of lands in lieu of the lands which they relinquished.[15] In so doing, all these acts—the 1874, 1897, 1904 and 1905 Acts— created or preserved, in the words of the 1940 Act, claims to "reimbursement on account of lands" granted under the 1866 Act. Indeed, nothing in the Supreme Court's opinion in *Krug* tends, in even the slightest degree, to support the notion that the 1940 Act only applies to rights directly deriving from land grant statutes, as opposed to those providing indemnity, lieu lands or other compensation. To the contrary, in *Krug*, the Court stated "we think Congress intended to bar any future claims by all accepting railroads which arose out of any or all of the land-grant acts, insofar as those claims arose from originally granted, indemnity or lieu lands." 329 U.S. at 598, 67 S.Ct. 540.[16]

1897, 1904, and 1905 Acts and allowed the railroads to select comparable lands in substitution for lands they relinquished or on which conflicting claims existed—some of which statutes had grant language and others of which did not. *See, e.g.*, Act of March 2, 1899, 30 Stat. 993, 994 (granting the Northern Pac. R.R. Co. nonmineral public lands in exchange for releasing to the United States lands in the Pacific Forest Reserve); Act of August 5, 1892, 27 Stat. 390, 391 ("That the said railway company is hereby permitted to select, in lieu of any lands forming odd-numbered sections of parts thereof . . . an equal quantity of non-mineral public lands"); Act of July 2, 1864, 13 Stat. 365, 367–68. And these examples represent only a small fraction of these types of statutes—the Supreme Court listed 25 other land grant/right of way statutes in *Southern Pac. Co. v. United States*, 307 U.S. 393, 399 n. 9, 59 S.Ct. 923, 83 L.Ed. 1363 (1939). *See also* Thomas E. Root, Railroad Land Grants from Canals to Transcontinentals 119–20 (1986) (indicating that 61 railroads were recipients of land grants to aid in railroad construction). Given the diversity of these many enactments, one can readily understand why the Supreme Court concluded that Congress necessarily painted with a broad brush in enacting Section 321(b) of the 1940 Act.

15. By the Act of June 22, 1874, 18 Stat. 194, Congress provided that upon relinquishment of lands granted by the 1866 Act, the railroads should be entitled to select in lieu thereof an equal quantity of other lands within the limits of the grant, "to which they [the railroad] shall receive title the same as though originally granted." Similarly, the Act of April 28, 1904, 33 Stat. 556, provided for the relinquishment of any section of the granted lands in the Territory of

New Mexico when any portion of the section had been occupied by settlers, and gave to the railroad the right to select other sections in lieu thereof. Like the 1897 and 1905 Acts considered in the instant case, the 1874 and 1904 Acts thus were essentially designed to allow the railroads to select comparable lands in substitution for the lands originally granted in 1866 that were later relinquished. *See Santa Fe Pac. R.R. v. Work*, 267 U.S. 511, 516, 45 S.Ct. 400, 69 L.Ed. 764 (1925) ("This act of 1874 was intended to induce the railroad companies to relinquish such lands . . . by promising in lieu thereof other lands of equal area in both odd and even sections within the prescribed limits.").

16. Plaintiff quotes selectively from the government's brief in *Krug*, suggesting that the government's arguments there hinged on the fact that the 1874 and 1904 Acts were themselves land granting statutes and, thus, *in pari materia* with the original grant of 1866. Other portions of the government's brief in that case, however, clearly show that its arguments were not so limited and, indeed, embraced the construction of the 1940 Act and release that the Supreme Court in *Krug* ultimately adopted. In this regard, the government in *Krug* (quoting from the same Santa Fe release here at issue) argued:

As we shall show, the claims here in question under the Acts of 1874 and 1904 were for lands in aid of construction. But even on respondent's view, that its selection rights under these Acts were not claims to lands granted in aid of construction . . ., they were indubitably "claims * * * to * * * *compensation or reimbursement therefor on account of lands* * * * granted * * * in aid of the construction of any portion of its railroad," and so were extinguished by the release. It is significant

Moreover, this court is not the first to conclude that *Krug* applies to property interests and claims deriving from the 1897 Act. Such, indeed, was the holding of the Ninth Circuit in *Neuhoff v. Secretary of the Interior*, 578 F.2d 810, 814 (1978), in which the court found:

> Although appellants seek to distinguish *Krug* because the "lieu lands" involved in *Krug* were obtained under a different statute, this distinction is unimportant in the construction of the 1940 Act in view of our determination that the Forest Lieu Exchange Act is applicable to lands received by railroads for the construction of their lines. It is clear that, just as in *Krug*, the right to select lieu lands was plainly "compensation or reimbursement" for lands originally granted to aid in the construction of the railroad.

*Id.* at 814.[17] Notably, the Ninth Circuit made short shrift of another argument that plaintiff resurrects here, *to wit*, that its rights to lieu lands under the 1897 Act and

the 1902 contracts were received in return for its surrender of "patented lands" and, therefore, not subject to Santa Fe's release, which reserved "lands which had been patented or certified to the company or any predecessor in interest."[18] In this regard, the Ninth Circuit stated that "[w]e cannot accept this interpretation, because it is perfectly clear from the face of the Act that the only lands excepted from the release requirement in order for the railroad to become entitled to its benefits are lands which are in fact patented." *Id.* "The fact that the rights were obtained in exchange for lands which the railroad had previously patented when it made the surrender pursuant to the 1897 Act," the court concluded, "does not change the character of the rights which the claimant press here." *Id.*[19]

Nor is it material that various Interior officials, prior to 1970, may have shared plaintiff's limited view of the scope of the 1940 Act and its waiver thereunder. In this

that so much of the language of the release as is italicized in the preceding sentence is pointedly ignored in respondent's argument.... Whatever else they may be, the claims here asserted are obviously for compensation on account of lands granted in aid of construction, lands which had been reconveyed to the United States under the Acts of 1874 and 1904. The Railroad exchanged its rights to those claims in return for a right to collect full commercial rates from the Government." Brief for Petitioner at 14–15, *Krug v. Santa Fe Pac. R.R. Co.*, 329 U.S. 591, 67 S.Ct. 540, 91 L.Ed. 527 (1947) (starred omissions and emphasis in original). At a later point in its brief, the government reiterated: "We repeat what we said above, ..., the basic and all-pervading error of the court below lay in its failure to understand that the release covered not only claims to lands granted in aid of construction but also claims to compensation on account of lands granted in aid of construction." *Id.* at 32.

**17.** Defendant argues that, under *Neuhoff*, plaintiff is barred by collateral estoppel from relitigating whether it released its claims to the subject properties under the 1940 Act. However, in *Neuhoff*, Santa Fe was represented by its "attorneys in fact" and the court believes it unclear whether the interests of those parties were adequately aligned with those of Santa Fe so as to ensure that the railroad's interests were fully represented. In these circumstances, the court holds that collateral estoppel does not apply here. *See Mother's Restaurant Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir.1983).

**18.** In raising this argument, Santa Fe is careful not to suggest that its release was somehow narrower than what the 1940 Act required. Were that true, Santa Fe would be ineligible to receive the increased tariffs provided by that act, seemingly exposing it to claims that it has been overcharging the government for the past sixty years.

**19.** In arguing that its in lieu lands should be treated as "patented," plaintiff relies on *Santa Fe Pac. R.R. Co. v. Cord*, 14 Ariz.App. 254, 482 P.2d 503 (1971), *cert. denied*, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971), in which assignees of land section rights under the 1897 Act sued Santa Fe claiming that the railroad had destroyed their rights by effectively reconveying them to the United States in 1955, 1956, and 1957. Remarkably, in response to that claim, Santa Fe made the same argument that it now so vigorously contests—that it had released its rights under the 1940 Act and that any claim against it for that release had long since been barred by the statute of limitations. *See id.* at 507–08. The Arizona court disagreed, holding that because the grants lands were patented to the railroad prior to the 1897 Act, these lands were no longer "grant lands" and, therefore, section 321(b) of the 1940 Act was inapplicable. *See id.* at 510. This distinction, however, finds no support in the statute's language and also ignores the fact that the lieu land at issue in *Krug, supra,* had also been received in exchange for patented land, a fact that seemingly had no impact whatsoever on the Supreme Court's decision.

regard, plaintiff attempts to pile a Pelion of conjecture upon an Ossa of speculation by relying on: (i) various communications from Department of Interior officials that it states can be read as supporting its claim that the 1940 Act did not apply to reimbursement made available under the 1897 and 1905 Acts;[20] and (ii) the fact that, between 1941 and 1957, the Department of the Interior approved applications for lieu lands and granted at least thirteen quitclaim deeds to Santa Fe, thereby illustrating that the Department agreed with Santa Fe's construction of its 1940 Act release. But like the Greeks of old, whose stone pile atop Mt. Olympus failed to reach the heavens, plaintiff's reliance on these materials falls short for several reasons.

First, these prior actions by agency officials, which were not arrived at through formal adjudication or notice-and-comment rule making, arguably do not demonstrate the agency's formal position on this issue.[21] *See Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 1662–63, 146 L.Ed.2d 621 (2000); *Reno v. Koray*, 515 U.S. 50, 61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995). Second, even were these actions indicative of the agency's formal position, it is beyond peradventure that an agency may change its mind, provided, critically, its new position is supported by the law. *Good Samaritan Hosp. v. Shalala*, 508 U.S. at 416–17, 113 S.Ct. 2151, 124 L.Ed.2d 368; *Automobile Club of Mich.*

*v. Commissioner*, 353 U.S. 180, 180–83, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); *Manhattan General Equipment Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936). Indeed, it appears that at least since 1970, the Secretary has consistently construed the 1940 Act as applying to claims such as those presented. *See* 13 IBLA 363, 374 (1973). Finally, this court's ruling is not based, to any real degree, on deference to the agency's construction, but instead is founded squarely on the plain words of the relevant statute. *Cf. Good Samaritan Hosp.*, 508 U.S. at 414, 113 S.Ct. 2151 ("Confronted with an *ambiguous* statutory provision, [courts] generally will defer to a permissible interpretation espoused by the agency entrusted with its implementation.") (emphasis added). In these circumstances, plaintiff's reliance on the alleged inconsistent actions taken previously by Interior officials is wholly unavailing, particularly as any such actions find utterly no support in the relevant statutory language. *See Manhattan Equip.*, 297 U.S. at 134, 56 S.Ct. 397 ("The power of an administrative officer ... to administer a federal statute ... is not the power to make law, ..., but the power to ... carry into effect the will of Congress as expressed by the statute.").

Plaintiff makes various other assertions in an effort to sidestep *Krug* and *Neuhoff*, but this court finds those assertions likewise un-

---

**20.** Most of the examples cited by Santa Fe are, at best, ambiguous, constituting general descriptions of the scope of the 1940 Act that simply omit any explicit reference to rights under the 1897 Act. Perhaps the best indication that some Interior officials initially shared plaintiff's view of the 1940 Act is a November 18, 1964, letter to Assistant Attorney General Ramsey Clark, from the Solicitor of the Department of Interior in which the Solicitor urged the Justice Department to correct an error in its brief filed in *Battle Mountain Co. v. Udall*, Civ. No. 64–29 (D.Or.). The Solicitor advised:

On page 9, line 26, of the brief there is a statement implying that the release by the railroad company which resulted in the issuance of the quitclaim deed by the Bureau of Land Management, was made pursuant to Section 321 of the ... [1940 Act]. This is not true as that act was not involved in the release by the railroad company of its rights to select lands in lieu of those within the forest reserves in order

to be entitled to a quitclaim deed for the lands it had once relinquished to the United States for the selection right.

Subsequently, the Justice Department corrected its brief to conform to this advice.

**21.** Indeed, in a formal decision entered May 15, 1943, the General Land Office of the Department of Interior broadly described the scope of the 1940 Act and plaintiff's release thereunder, stating:

The releases, in conformity with the Transportation Act and the regulations, are broad and include all rights and claims pursuant to, growing out of, or arising from the grants except the three types of claims specifically excluded therefrom, ..., relative to patented, clear-listed, and sold lands.

*See Santa Fe Pac. R.R. Co.*, U.S., Dec. Com. GLO (May 15, 1943), *aff'd*, 58 Interior Dec. 596 (1944).

persuasive.[22] Rather, based upon those cases, as well as this court's own, independent construction of the relevant statutes, this court concludes that plaintiff's release under the 1940 Act precludes it from recovering under the 1993 Act.

## III. Conclusion

As noted in *Strickland v. United States,* 199 F.3d at 1314, the 1993 Act was designed to deal with situations where "title was previously transferred to the United States but for which no compensation was received...." This is not such a case, for here, Santa Fe has received and will continue to receive compensation on account of its prior claims in the form of increased tariffs for the carriage of government freight. Having made this deal under the 1940 Act, Santa Fe is in no position to reopen that legislative compact and seek compensation under the Fifth Amendment for interests it has already waived. *See Anderson v. Wilson,* 289 U.S. 20, 27, 53 S.Ct. 417, 77 L.Ed. 1004 (1933) (Cordozo, J.) ("We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it."). Based on the foregoing discussion, summary judgment is **GRANTED** for the defendant and plaintiff's cross-motion is **DENIED**.

**IT IS SO ORDERED.**

---

22. Plaintiff's position draws no support from the Federal Circuit's recent decision in *Strickland, supra.* In that case, the Federal Circuit concluded that the Sisk Ask could not be viewed as vesting title in the United States to property relinquished under the 1897 Act because such a reading would render the 1993 Act a nullity. In this regard, the court reasoned:

It could hardly have been Congress' intent to enact a statute for which there was no longer a purpose. Indeed, the enactment of legislation presupposes some change in existing law....

The policy underlying all of the "last chance" statutes is the same: to close out those claims left open by repeal of the 1897 Act. Each time Congress enacted a "last chance" statute, it reaffirmed this purpose and resurrected the claims of those who had not yet applied for or received compensation. To read the [1993] Act otherwise is to render it ineffective and superfluous.

199 F.3d at 1315. Here, by comparison, this court's reading of the 1940 Act and plaintiff's release thereunder does not deprive any later statute, including the 1993 Act, of vitality.